**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **Nichole Y. Sartor** | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | No. __06-4044__ |
| | § | |
| **Union Pacific Corporation,** | § | |
| **Union Pacific Railroad Company** | § | |
| *Defendant.* | § | |

<u>SUBJECT TO ITS MOTION TO DISMISS PURSUANT TO</u>
<u>FED. R. CIV. 12(b)(2) FOR LACK OF PERSONAL JURISDICTION,</u>
<u>UNION PACIFIC CORPORATION'S MEMORANDUM IN SUPPORT OF MOTION TO</u>
<u>DISMISS PURSUANT TO FED. R. CIV. P. 12 (b)(6)</u>

COMES NOW Defendant Union Pacific Corporation ("Union Pacific Corp."), and subject to its Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction, files its Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) asking the Court to dismiss this action in its entirety on the ground that Plaintiff's claims are preempted by federal law, specifically, the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20101, et seq., the Hazardous Material Transportation Act ("HMTA"), 49 U.S.C. § 5101, et seq., and regulations promulgated, respectively, thereunder.  In support of its motion, Union Pacific Corp. would show the following:

### I.   <u>BACKGROUND</u>

On October 15, 2005, a Union Pacific Company train which was moving through Union Pacific Company's Texarkana yard, collided with a forward train awaiting departure from the yard.  Plaintiff alleges that, as a result, a railcar containing a chemical (believed to be propylene

gas) began to leak, causing a fire and ensuing explosion which damaged her unoccupied real property and personal property.

This action was filed on June 2, 2006. The purported claims have a common premise: Defendants' alleged operations caused a discharge of allegedly hazardous chemicals, which, in turn, caused plaintiff's alleged damages.  *See* Plaintiff's Complaint (hereinafter "Complaint"). The issues that are pleaded generally include allegations that "Defendants failed to prevent these hazardous materials and/or substances from entering into the surrounding area and properties." Complaint, page 3.

Specifically, Plaintiff alleges the following claims:

1.      **Negligence**:  Plaintiff alleges that Union Pacific Corp. "operated and/or owned trains and rail cars containing hazardous materials and/or substances," and "defendant created a foreseeable risk of harm to Plaintiff and all others . . . and this is a risk of which defendants knew or should have known through exercise of reasonable care." *See* Complaint, ¶¶ 16-17.  Plaintiff further alleges that the duty owed by Defendants is "defined through the common law and ***statutory rules, codes, and regulations***." *See* Complaint, ¶ 15 (emphasis added).  Plaintiff further contends Defendants were negligent in the "operations of its rail cars, in allowing toxic materials and/or substances to be stored and/or transported in an unsafe manner [and] allowing and/or failing to prevent hazardous materials and/or substances from entering in and throughout the surrounding area…" *See* Complaint, ¶ 18.

2.      **Negligence Per Se**:[2] The alleged violations of  "***federal, state, and local statutes, codes, rules and/or regulations***" undergirds Plaintiffs' negligence *per se* claims.  *See* Complaint,

---

[2] Plaintiff's Complaint includes a cause of action for negligence *per se*.  Plaintiff alleges that "Defendant owed Plaintiff, a duty of care as that is encompassed in federal, state, and local statutes, codes, rules, and/or regulations."

¶ 22 (emphasis added).  Plaintiff further invokes the application of statutes and regulations by stating that the "Plaintiff is in the class of individuals that these statutes, codes, rules, and/or regulations are designed to protect and damages suffered by Plaintiff are the type sought to be prevented by these statutes, codes, rules, and/or regulations.  *See* Complaint, ¶ 23. Importantly, as discussed *infra*, plaintiffs concede that the "statutes, codes, rules and regulations" define Union Pacific Railroad's "duty of care." *See* Complaint, ¶ 22.

**3.**     **Trespass**:  Plaintiff alleges that Defendants "allowed and/or caused hazardous materials and/or substances to be released from their place of business and spread throughout the surrounding area including the property and home of Plaintiff."   *See* Complaint, ¶ 29.  The trespass allegations thus turn on the same claim of negligence in the storage and handling of hazardous chemicals as do the negligence claims.  *See* Complaint, ¶¶ 27 and 31.

**4.**     **Conversion:**   Plaintiff alleges that "defendants allowed and/or caused hazardous materials and/or substances to be released from their place of business and to spread in and throughout the surrounding area, including the property and home of the Plaintiff." *See* Complaint, ¶ 34.  As such, Plaintiff contends that her "right of possession has been interfered with" and she "has been deprived of the free use and enjoyment of her personal property." *See* Complaint, ¶ 34.  The conversion allegation turns on the same claim of negligence in the storage and handling of hazardous chemicals as do the negligence and trespass claims. *See* Complaint, ¶¶ 32 and 36.

---

Complaint, ¶ 22.  In addition to the arguments set forth below, Plaintiffs' claim of negligence *per se* should be dismissed for the additional reason that the Arkansas Supreme Court has held that a violation of a law is not negligence *per se*.  *See Young v. Dodson*, 239 Ark. 143, 388 S.W.2d 94 (1965) relying on *Rogers v. Stillman*, 223 Ark. 779, 268 S.W.2d 614 (1954) (…we have held, on several occasions, that a law violation does not constitute negligence *per se*, but is only evidence of negligence).  Because the Arkansas courts do not recognize the claim of negligence *per se*, Plaintiff's claim for same should be dismissed for this reason as well.

**5.**   <u>Nuisance</u>:   Plaintiff alleges that the Defendants' acts and/or omissions have resulted in hazardous chemicals entering Plaintiff's home and personal property which "created a continuing nuisance that is hazardous and damaging to both the public at large and to Plaintiff." *See* Complaint, ¶ 39.   Plaintiff further alleges that "Defendants allowed and/or failed to prevent hazardous material substances from escaping its place of business and enter onto and in the surrounding area, including Plaintiff's property."   *See* Complaint, ¶ 38. Accordingly, Plaintiff's claim for nuisance is based on Defendants' alleged negligence in the storage and handling of "hazardous materials and/or substances."   *See* Complaint, ¶ 38.

**6.**   <u>Strict Liability</u>:   Plaintiff also alleges that since Defendants   "operate and/or owned trains and rail cars containing hazardous material and/or substances" that "contained abnormally dangerous and/or extremely hazardous chemicals," they are liable for any alleged damage caused by combustion, explosion, and rupture regardless of the precautions taken by Union Pacific.   *See* Complaint, ¶ 43.   Notably, Plaintiffs provide no additional basis for strict liability other than the operation of railcars and the mere presence of chemicals in the railcars.

All of Plaintiff's claims—whether based on state common law or statutory law—are preempted by the comprehensive federal regulation of railroad operations and the transportation of hazardous materials by rail.   Further, as established by governing Supreme Court and Eighth Circuit authorities, as well as the opinions of other courts, the FRSA does not provide for a private right of action and, accordingly, Plaintiff's claims must be dismissed in their entirety.

## II.   <u>ARGUMENT</u>

A court has the authority to dismiss a suit for failure to state a claim upon which relief can be granted if the complaint clearly demonstrates that plaintiff cannot prove any set of facts that would entitle her to relief.  *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229,

2232 (1984).  In this case, Plaintiff cannot prove any set of facts that would entitle her to relief because all of her state law claims are preempted by the FRSA, and the HMTA as applied to rail transportation.

### A.  Congress' Preemptive Intent With Respect to Railroad Safety

Preemption is well recognized, particularly in the area of railroad safety.  When Congress acts under its constitutional authority and manifests an intent that federal law occupy and control a certain field, the states are precluded from interfering in any way with the federal scheme.  U.S. Const. art VI, cl.2.  In such instances, the federal interest is deemed by Congress to be of sufficient importance to justify the curtailment of the state's authority with respect to the subject matter.  Whether the encroaching state law in question is based on statute, ordinance or state tort law, that law is displaced.  *See CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 663 (1993).  The preeminent national interest at issue here is embodied in the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20101, et seq., which authorizes the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety."  49 U.S.C. § 20103.  That authority is delegated to the Federal Railroad Administration ("FRA") whose job it is to "carry out the functions vested in the Secretary under the FRSA."  49 C.F.R. § 1.49.  Pursuant to this authority, the FRA established a "national railroad safety program to promote safety in all areas of railroad operations in order to reduce deaths, injuries and damage to property resulting from railroad accidents." 49 C.F. R. § 212.101(a).

The clarion call of the FRSA is uniformity of regulation.  Having rejected the piecemeal, patchwork system of rail regulation, which existed prior to the Act's passage, Congress curtailed the state's involvement because it did "not believe that safety in the Nation's railroads would be advanced sufficiently by subjecting the national rail system to a variety of enforcement in fifty

different judicial and administrative systems." H.R. Rep. No. 91-1194, reprinted in 1970 U.S.
C.C.A.N. 4104, 4109.[3]

To assure that railway safety is "nationally uniform to the extent practicable," Congress
wrote into the FRSA an explicit preemption clause permitting the state to regulate railroad safety
only "until the Secretary of Transportation prescribes a regulation or issues an order covering the
subject matter of the state regulation." 49 U.S.C. § 20106.[4] Once the FRA issues a regulation
that covers a railroad safety matter, state regulation in the covered area, either by statute or by
jury award, is preempted. *Easterwood*, 507 U.S. at 663. The rail safety legislation precludes
local and state interference in favor of federal government oversight. *See Peters v. Union Pac.
R.R. Co.*, 80 F.3d 257, 261 n.2 (8th Cir. 1996).

It matters not that the federal regulation was promulgated pursuant to the FRSA or some
other federal statute dealing with rail safety issues. Any such federal regulation will have
preemptive effect over state laws covering the same subject matter. For example, "The FRSA's
preemption clause 'appl[ies] to the HMTA as it relates to the transportation of hazardous

---

[3] The legislative history of FRSA evidences clear congressional intent that rail safety regulations be nationally
uniform and that all enforcement should be by federal authority:

> With the exception of industrial or plant railroads, the railroad industry has very
> few local characteristics. Rather, in terms of its operations, it has a truly
> interstate character calling for a uniform body of regulations and enforcement. . .
> To subject a carrier to enforcement before a number of different state
> administrative and judicial systems in several areas of operation could well
> result in an undue burden on interstate commerce. 1970 U.S. C.C.A.N. at 4110-
> 11.

[4] Section 20106 contains a "savings clause" which is to be narrowly construed. *See Easterwood v. CSX Transp., Inc.*,
933 F.2d 1548, 1533, n. 3 (11th Cir. 1991), *aff'd*, 507 U.S. 658 (1993); *Cox v. Norfolk & Western Ry. Co.*, 998
F.Supp. 679, 687 (S.D. W. Va. 1998). Section 20106 allows states to adopt or continue in force state laws related to
railroad safety when the law (1) is necessary to eliminate or reduce an essentially local safety hazard; (2) is not
incompatible with a law of the United States government; and (3) does not unreasonably burden interstate
commerce. An essentially local safety hazard has been defined as one which is not capable of being adequately
encompassed within uniform national standards and is therefore inapplicable here. The Plaintiff's allegations of
improper freight car and train inspection, transportation of alleged hazardous materials, operation of railcars, and

materials by rail.'" *Mayor & City Council of Baltimore, et al. v. CSX Transp., Inc.,* 404 F. Supp. 2d 869, 876 (D. Md. 2005) (quoting, *CSX Transp., Inc. v. Public Utilities Com'n of Ohio*, 901 F.2d 497, 501 (6th Cir. 1990), *cert. denied*, 498 U.S. 1066 (1991) and citing, *CSX Transp. v. Williams*, 406 F.3d 667, 671 n.6 (D.C. Cir. 2005))("FRSA preemption can apply even though [the regulation] was expressly promulgated pursuant to the HMTA, 49 U.S.C. § 5101, et seq.").

The HMTA, as applied to transportation by rail, provides a uniform, comprehensive, and exclusive regulatory scheme with respect to the handling, storage and transportation of hazardous materials. *See* 49 U.S.C. § 5101, et seq.  The gravamen of Plaintiff's Complaint is that the chemical contained in the railcar in question was "hazardous" and its mere presence, whether stored, handled or transported, creates liability on Union Pacific.  That the regulations allow railroads to transport, as well as store such chemicals, is manifested by Section 5103(b) of the Act:

> **(b)  Regulations for safe transportation.**  (1) The Secretary shall prescribe regulations for the safe transportation, including security, of hazardous material in intrastate, interstate, and foreign commerce.  The regulations –
>
> **(A)** apply to a person –
>
> (i)     transporting hazardous material in commerce;
>
> (ii)    causing hazardous material to be transported in commerce; or
>
> (iii)   manufacturing, fabricating, marking, maintaining, reconditioning, repairing, or testing a packaging or a container that is represented, marked, certified, or sold by that person as qualified for use in transporting hazardous material in commerce; and
>
> **(B)**  shall govern safety aspects, including security, of the transportation of hazardous material the Secretary considers appropriate.

---

storage of alleged hazardous materials do not describe conditions specific to a particular locality but rather those that could occur anywhere within the rail system.

In addition, Section 5106 provides:

> The Secretary of Transportation may prescribe criteria for handling hazardous material, including—
>
> > (1) a minimum number of personnel;
> >
> > (2) minimum levels of training and qualifications for personnel;
> >
> > (3) the kind and frequency of inspections;
> >
> > (4) equipment for detecting, warning of, and controlling risks posed by the hazardous materials;
> >
> > (5) specifications for the use of equipment and facilities used in handling and transporting the hazardous materials; and
> >
> > (6) a system of monitoring safety procedures for transporting the hazardous material.

Section 5101 states that "[t]he purpose of this chapter is to provide adequate protection against the risks to life and property inherent in the transportation of hazardous material by improving the regulatory and enforcement authority of the Secretary of Transportation."  The Secretary of Transportation has, in fact, exercised this authority, *see* generally, 49 C.F.R. Parts 171-80, and specifically with respect to propylene at § 172.101 and Appendix A to § 172.101 (List of Hazardous Substances and Reportable Quantities).

The FRSA and HMTA speak directly to the matters alleged in Counts 1-5 of Plaintiff's Complaint, (¶¶ 2 14 –45), that is Union Pacific's duty to safely handle hazardous materials intended for transport.  Union Pacific's duties, as they relate both to the operation of trains under the circumstances herein and the handling of propylene, have been exhaustively defined by the regulations promulgated pursuant to these Acts.  Union Pacific therefore submits that, in order to effectuate Congressional intent, plaintiff's claims must be deemed preempted.

**B.     What Triggers FRSA or HMTA Preemption:  "covering the subject matter," NOT compliance with the regulations**

In the seminal case of *CSX Transportation, Inc. v. Easterwood*, the U.S. Supreme Court stated that where Congress' preemptive intent is made express, the task of statutory construction must "focus on the plain wording of the clause." 507 U.S. at 664.  The plain wording of the FRSA's preemption clause instructs that state law can remain in force only "until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such state requirement."  The issue, as framed by the Supreme Court in *Easterwood*, is "whether the Secretary of Transportation has issued regulations covering the same subject matter as [the state's] negligence law…."   In its opinion, the Court stated as follows:

> To prevail on the claim that the regulations have preemptive effect, petitioner must establish more than that they "touch upon" or "relate to" that subject matter [citations omitted] for "covering" is a more restrictive term which indicates that preemption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law.

*Easterwood*, 507 U.S. at 664 (citation omitted).

*Easterwood*, therefore, pretermits, not only an examination of the purposes behind the adoption of the federal regulations, but also an inquiry into the state's interest in the matter regulated.  Once the Secretary's statutory authority has been exercised, piecemeal regulation of individual hazards within the concerned subject matter would disrupt the overriding goal of uniformity of rail safety regulations and ultimately contravene the public interest.  Federal rail regulations do not just establish a minimum safety standard:  they preclude all state regulation. *Easterwood*, 507 U.S. at 674.  "The FRSA preemption provision . . . authorizes the Court *only* to

determine whether the regulation covers the subject matter," and if the Court's conclusion is yes, preemption applies. *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 672 (D.C. Cir. 2005).

In *Norfolk So. Ry. Co. v. Shanklin*, 529 U.S. 344, 357-58 (2000), the United States Supreme Court held that if FRSA "coverage" is found, "[i]t is this displacement of state law concerning the [subject matter], and not . . . adherence to the [federal] standard . . . that preempts state tort actions."[5]   The determination of whether state law is preempted by federal law does not concern an examination of the compliance with, or the adequacy of, the federal regulation.  529 U.S. at 357-58; *see also Mehl v. Canadian Pac. Ry., Ltd.*, 417 F. Supp. 2d 1104, 1116 (D.N.D. 2006) (plaintiffs argument that preemption does not apply unless the railroad complied with the FRA regulations is "contrary to the Supreme Court law, which holds that compliance is *not* a part of the preemption analysis")(emphasis in original).  The "FRSA's preemption language . . . does not differentiate between instances where a [railroad] has complied with a federal regulation and where it has not."  *Ouellette v. Union Tank Car Co.*, 902 F. Supp. 5, 10 (D. Mass. 1995).  The Court in *Kalan Enterprises, LLC. v. BNSF Railway Co.,* 415 F. Supp. 2d 977, 980 (D. Minn. 2006) vigorously made the point:

> Plaintiff asks this Court to find that, for BNSF to invoke the FRSA's preemption, BNSF must not only prove that the regulations cover the subject matter of plaintiff's claims, but also its compliance with those regulations.  The Court declines this invitation.  To do so would turn Congress's preemption on its head, and eviscerate its effect.  Plaintiff essentially asks the Court to rule that only a perfect railroad is covered by the FRSA.  A railway which erred would, perforce, be denied FRSA preemption.  This option would certainly "protect" perfection, but any railroad experiencing problems would be subject to multiple levels, kinds, and styles of state regulations – which is exactly what Congress sought to preempt

---

[5] In her dissent, Justice Ginsberg noted that "the upshot of the Court's decision is that state negligence law is displaced with no substantive federal standard of conduct to fill the void".  *Shanklin*, 529 U.S. at 361 (*Ginsberg, J., dissenting*).  Although this may be the case, "unfortunately this result is necessary to vindicate the intent of Congress . . . [I]nevitably these tort actions would generate precisely those inconsistencies in railroad safety standards that Congressional action was intended to avoid."  *Oulette*, 902 F.Supp., at 10 (D. Mass. 1995).

within the ambit of the prescribed regulations.  The Court rejects plaintiff's "compliance" theory of preemption.  Neither the United States Supreme Court, nor the Eighth Circuit Court of Appeals require railroads to prove FRA compliance before allowing state law preemption.  ***Both Courts deem coverage, rather than compliance to be preemption's touchstone***.  (Footnote omitted; emphasis added).

Preemption, in the words of *Kalan Enterprises*, is not limited to perfect railroad operations.[6]

Recently, the Eighth Circuit has held that negligent railcar safety and inspection claims are preempted by the FRSA's regulations regardless of whether the railroad actually fulfilled its obligations under those regulations.  *See In re Derailment Cases*, 416 F.3d 787 (8th Cir. 2005) (also referred to as *Scottsbluff*).  The *Scottsbluff* decision involved a derailment of eighteen railroad cars, many of which breached, and leaked benzene and other hazardous materials, requiring an evacuation of 1100 residents.  Investigation revealed a problem with the coupling device that connected the railcars.  Plaintiffs based their negligence claims on the railroad's failure to discover the defective coupler, which allegedly caused the derailment.

The district court granted summary judgment in favor of the railroad concluding that the claims were preempted by the freight car safety regulations found at 49 C.F.R. § 215, and in particular, those that covered pre-departure inspections.  The plaintiff appealed, contending that FRSA's regulations do not substantially subsume the subject matter of their negligent inspection claims because the regulations did not specify the manner in which freight car inspections must be accomplished.  416 F.3d at 794.  The plaintiffs' appeal was rejected, and the district court's grant of summary judgment was upheld.  The Eighth Circuit court determined that "a regulatory framework need not impose bureaucratic micromanagement in order to substantially subsume a particular subject matter." *Id.; see also Williams,* 406 F.3d. at 672 ("the FRSA preemption

provision  . . . authorizes the court only to determine whether the regulation covers the subject

matter, leaving it to [the federal agency] to gauge the efficacy of the . . . measures based on the

agency's expertise").  In rejecting the plaintiffs' claim of negligence as well as *res ipsa loquitur,*[7]

the Court held:

> It is clear that the FRA's regulations are intended to prevent
> negligent inspection by setting forth minimum qualifications for
> inspectors, specifying certain aspects of freight cars that must be
> inspected, providing agency monitoring of the inspectors, and
> establishing a civil enforcement regime.  These intentions are
> buttressed by FRA's manual for federal and state inspectors.
> Further, there is no indication that the FRA meant to leave open a
> state tort cause of action to deter negligent inspection.
> Accordingly, we conclude that plaintiffs' negligent inspection
> claims are preempted by the FRA regulations.

*Scottsbluff,* 416 F.3d at 794 (citations omitted).  *See also Kalan Enterps., LLC,* 415 F. Supp. 2d

at 982 ("Questions of train inspections fall squarely in the midst of multiple FRA regulations;"

**"negligent railcar movement" is also covered by 49 C.F.R. §215**) (emphasis added); *Mehl,*

417 F. Supp. 2d at 1106 (in derailment and release of anhydrous ammonia case, negligent

inspection and negligent operation claims are preempted by FRSA -- motion to dismiss granted).

Application of federal preemption in this fashion has been uniformly followed by district

courts in the Eighth Circuit and elsewhere.  As mentioned previously, the court in *Kalan*

---

[6] As discussed below, enforcement of the FRSA is left to the exclusive authority of the Secretary of Transportation, evidencing that a failure to comply with the regulations does not leave open a state law cause of action for enforcement.  49 U.S.C. § 20111.

[7] Although Plaintiffs did not allege a *Res ipsa loquitur* claim, it also would  have been preempted:

> Finally, plaintiff falls back on an unsupportable claim of *res ipsa loquitur.*  This
> theory simply asks the Court to infer negligence based upon circumstantial
> evidence – it is merely negligence in Latin clothing, and it remains preempted.
> Plaintiff's problem is not that there is no evidence of negligence; its problem is
> that there is such evidence, and claims based upon it are preempted by an Act of
> Congress.

*Kalan Enterps., LLC,* 415 F. Supp. 2d at 982 (citation omitted).

*Enterprises* held that preemption, pursuant to the FRSA regulations, applied to the plaintiff's causes of action for FRA violations, operation of a defective train at an unsafe speed, negligent application of the emergency air brake system, negligent make-up of the train and car placement, violations of field manuals, negligent railcar movement, and "other acts of negligence."  415 F. Supp. 2d at 982.  Finding no private right of action, the *Kalan* court dismissed the plaintiff's complaint with prejudice.  *Id.* at 982-83.

In *Mehl*, the court held that claims brought on behalf of injured residents of a community near railroad tracks based on the release of anhydrous ammonia were preempted by the FRSA and applicable regulations.  In the *Mehl* case, the plaintiffs allege seven different claims, most of which mirror the claims brought in the instant case: (1) negligence (2) private nuisance (3) public nuisance (4) trespass on land (5) strict liability (6) intentional infliction of emotional distress, and (7) negligence per se. *Id* at 1107.  The *Mehl* court applied the Eighth Circuit's *Scottsbluff* decision and determined that all of the claims were preempted by the FRSA and related regulations.  *Id.* at 1116-19.  The Court explicitly recognized that preemption, like it or not, "absolved railroads from any common law liability for failure to comply with the safety regulations."  *Id.* at 1120.

In *Mayor & City Council of Baltimore v. CSX Transp., Inc.,* 404 F. Supp. 2d 869 (D. Md. 2005), the court held that the City's common law claims against the railroad were preempted by the federal regulations promulgated pursuant to the FRSA and HMTA.  The city, mayor, city council, commissioner of the city department, and city parking authority sought to recover millions of dollars in damages allegedly suffered as a result of the defendant's negligence in connection with a train derailment.  The court held that the "analysis turns on whether regulations issued under the FRSA and HMTA cover or substantially subsume the subject matter

of the City's negligence claims . . ." not on whether the railroad complied with those regulations. *City of Baltimore,* 404 F.Supp.2d at 877. That is the issue for this Court. As in *Scottsbluff, Mehl, Kalan Enterprises* and *City of Baltimore*, Union Pacific submits that the regulations undeniably cover the subject matter of plaintiff's claims herein.

### C.   All of Plaintiff's Claims are Based on Matters Covered by the Federal Regulations and are Preempted

Plaintiff alleges explicitly that the duty owed by Union Pacific Railroad is based on and defined by "statutory rules, codes and regulations" See Plaintiff's Complaint ¶¶ 15, 22, 23, 27, 32, 37, 42. Plaintiff thus acknowledges and pleads specifically that her claim arises by virtue of alleged violations of those "statutory rules, codes and regulations"—invoking the very federal law regime which has preemptive effect. Plaintiff's Complaint is replete with explicit references to these rules and regulations, involving both the handling of "hazardous" materials and the safe operation of a railroad. In both respects, Plaintiff makes claims squarely governed by federal law. In doing so, she has admitted that her claims are covered by the applicable regulations and consequently that her claims are preempted. *See Kalan*, 415 F.Supp.2d at 981 (where plaintiff alleges violations of applicable standards, laws or regulations that cover the railroad's allegedly negligent acts – "[t]he fact that they do is the reason FRSA preemption is operative"); *see also City of Baltimore*, 404 F.Supp.2d at 878-79 (finding that the City's claims that the railroad failed to comply with the federal regulations constituted an admission that the claims were covered by federal regulations and were thus preempted).

### 1.   Plaintiff's claims based on improper transportation, storage, and handling of hazardous substances are preempted

Plaintiff indicates, at ¶ 11, that "Defendants failed to prevent these hazardous materials.. from entering into the surrounding area" and at ¶ 16 that "Defendants operated and/or owned

trains and railcars containing hazardous materials and/or substances." At paragraph 22, Plaintiff alleges Defendants allowed "toxic materials and/or substances to be stored and/or transported in an unsafe manner." Finally, at paragraphs 29 and 34, Plaintiff states that the "[d]efendants allowed and/or caused hazardous materials and/or substances to be released from their place of business . . ."

Plaintiff repeatedly alleges that Defendants were negligent in the manner in which it stored, handled, and transported "hazardous" material. The HMTA deals specifically with these functions. As previously stated, 49 U.S.C. § 5106 empowers the Secretary to enact regulations concerning "Handling Criteria," and § 5103(b), does the same with respect to "safe transportation" of hazardous materials. (*See, supra*, pp. 7-9).

The Secretary has acted pursuant to this authority in enacting 49 C.F.R. §§ 171-80. In *Mehl*, 417 F.Supp.2d at 1117-18 n.14, the Court found that these regulations prescribed detailed requirements for the transportation of hazardous materials by rail:

> Federal regulations cover the areas of maximum allowable speed and the transportation of hazardous materials. The regulations provide detailed requirements for the transportation of hazardous materials: 49 C.F.R. §§ 172.101 (listing materials classified as hazardous) 173.314 (requirements for compressed gases in tank cars and multi-tank cars), 173.315 (requirements for compressed gases in cars tanks and portable tanks), 174.200 (regulations governing labeling, handling and shipment of hazardous materials), 172.101 (prohibiting the transportation of certain hazardous materials).

*Id.*

The regulations establish a variety of compliance programs and certifications directed at those who transport designated materials, including specifications for railcars used in storing and transporting such materials: 49 C.F.R. § 179.5 (certification by manufacturers that railcar

conforms to requirements of specification); Section 179.7 (establishing a quality assurance program for each tank car facility); Section 180.509 (establishing requirements for inspection and test of specification tank cars); Section 180.511 (providing the parameters for acceptable results of inspections and testing).

Part 171 describes the scope of the regulations, specifically covering pre-departure functions such as classifying, loading, securing and labeling of materials as well as providing emergency response information, reporting and providing immediate notice of hazardous materials incidents, and segregating and containing hazardous materials.  Proper movement and storage of hazardous materials, including unloading of materials, is also within the scope of the HMTA regulations.

Part 172 provides specific instructions for transportation of certain materials to include specific warnings (§ 172.02) and requires tank car markings for hazardous materials (§172.300, et seq.).  Importantly, Subpart G of Part 172 entitled "Emergency Response Information" deals with information to be used in mitigating a hazardous materials incident, including description of the material, immediate hazards to health, risks of fire or explosion, immediate precautions to be taken, immediate methods for handling fires and spills or leaks as well as preliminary first aid measures.  Section 172.604 requires emergency response telephone numbers and Subpart H, "Training," requires that hazardous material employees be trained in all relevant regulations.

Part 174, entitled "Carriage by Rail," delineates unacceptable hazardous shipments, inspection protocols (§ 174.9), covers the removal and disposal of hazardous materials (§174.14), and non-conforming or leaking contents (§ 174.50).  More importantly, Section 174 sets the exclusive standards for handling and transporting the various classes of hazardous

materials by rail (Subparts D-K), including where cars should be placed (§ 174.84), how they should be labeled and at what speeds such cars can be moved (§ 174.86).

Section 171.1(c) provides for a scheme of penalties for infractions of the regulations.  A willful violation subjects an offender to a possible jail term.

Because Plaintiff's Complaint alleges that Defendants violated applicable standards as it relates to storing and transporting "hazardous" materials, Plaintiff has admitted that said conduct is covered by the pertinent federal statues and regulations.  *See Kalan*, 415 F.Supp.2d at 982. Whether the railroad complied with these exhaustive regulations is not at issue.  The issue before this Court is:  Do the comprehensive regulations regarding handling, storing and transporting hazardous materials cover the subject matter of plaintiffs' nuisance, trespass, conversion, negligence, negligence per se, and strict liability claims – all of which are based on the railroad's alleged negligence with respect to these very matters.  The clear answer is that the subject matter of Plaintiff's claims are indeed "covered."

## 2.  Plaintiff's claims of crew fatigue are "covered" and preempted

Plaintiff alleges in paragraph 8 of her Complaint that Defendants required the conductor to work "despite full knowledge of Mr. Gordon's fatigue."

Although Plaintiff further alleges in paragraph 18 that Defendants failed to "adequately monitor those responsible for the operation of the trains and cars," any alleged breach of a duty to ensure that crewmembers are not fatigued is governed by federal statutes and regulations, specifically the "Hours of Service Act," 49 U.S.C. § 21101, et seq., which covers the limitations on duty hours of train employees (§ 21103); limitations on duty hours of signal employees (§ 21104); and limitations on duty hours for dispatching service employees (§ 21105).  In addition, federal regulations further define and regulate "hours of duty" as it relates to railroad employees.

*See* 49 C.F.R. § 228.7.  Federal regulations specify, as well, the manner in which records are to be kept pertaining to the hours each railroad employee spends on the job.  *See* 49 C.F.R. § 228.11.  The regulations also establish a protocol to report excessive service of a railroad employee.  *See* 49 C.F.R. § 228.19.   A civil penalty may be imposed for failure to follow the regulations.  *See* 49 C.F.R. § 228.21.  This subject matter has been covered, and plaintiffs' "fatigue" claim is preempted.

### 3. Plaintiff's broad claims of negligent rail operations are also "covered" by the Secretary's regulations and preempted under the facts alleged.

Plaintiff repeatedly alleges, in general terms, that Defendants' negligence and "acts or omissions" were the cause of the damages sustained by the Plaintiff.

Pretermitting the fact that these claims are impermissibly vague and ambiguous, Union Pacific Corp. asserts that the actions which underlie this collision and subsequently alleged discharge are, again, substantially subsumed by the federal regulations.

First of all, engineer training and certification is governed by 49 C.F.R. § 240.  The design and integrity of railcars is covered by section 231 and the Safety Appliance Act, 49 U.S.C. § 20301, et seq. which wholly occupies the field of railcar design so as to prelude state law requirements, whether supplementary or conflicting.  *Southern Ry. v. Railroad Comm'n of Indiana*, 236 U.S. 439 (1914).

More specifically, in order to ensure safe railcar movement, a railroad's duty is to inspect each railcar each time a car is placed in a train.  49 C.F.R. § 215.11.  *See e.g., Scottsbluff*, 416 F.3d at 794 (§215 covers the subject matter of railcar inspections).  Of particular import, under the facts stated in Plaintiff's Complaint, is Part 221 which requires highly visible marking devices for the trailing end of the rear car of all freight trains; Part 232 which covers brake

system safety standards, EOT (end of train telemetry) devices, and inspection and testing requirements; Part 236 sets forth rules, standards, and instructions governing the installation, inspection, maintenance, and repair of signal and train control systems, devices, and appliances. Sections 213.9(a) and 218.35(b)(2) completely subsume the matter of safe train speed. *See CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 675 (200?)("We thus conclude that respondent's excessive speed claim cannot stand in light of the Secretary's adoption of the regulations in § 213.9."); *St. Louis Sw. Ry. v. Pierce,* 68 F.3d 276, 278 (8th Cir. 1995); *Mehl*, 417 F.Supp.2d at 1117-1118; *Kalan*, 415 F.Supp.2d at 982; and *Williams v. Burlington N.R.R. Co.*, 849 F.Supp. 682 (E.D. Ark. 1993).

Perhaps of greatest significance here is section 218(b)(2) which covers any potential allegation against the crew of the moving train based on failure to control speed, failure to keep a proper lookout, failure to make a timely application of braking equipment, or any other general allegation of negligence in the operation of this train within its yard:

> (2) Trains and engines, except designated class trains, within yard limits must move prepared to stop within one half the range of vision but not exceeding 20 m.p.h. unless the main track is known to be clear by block signal indications.

Section 218(b)(2), along with braking, end of train device, and train control system regulations, have "subsumed" any common law claim of negligence arising out of a train's failure to stop for a preceding train on its track.

### 4.     Any claim for state tort damages, including punitive damages, is preempted by the enforcement provisions under the FRSA and the HMTA.

Finally, that the regulations have closed the door on state tort claims regarding covered subject matters is undeniable in light of the enforcement and penalty scheme implemented by Congress which makes clear that only the Secretary of Transportation has the authority to issue

compliance orders or to impose civil penalties for violations of a railroad safety regulation.  *See* 49 U.S.C. § 20111.  As sections 20111(a) and (b) state:

> (a)   Exclusive authority.—The Secretary of Transportation has exclusive authority—

> (1) to impose and compromise a civil penalty for a violation of a railroad safety regulation prescribed or order issued by the Secretary;

> (2) except as provided in section 20113 of this title, to request an injunction for a violation of a railroad safety regulation prescribed or order issued by the Secretary; and

> (3) to recommend appropriate action be taken under section 20112(a) of this title.

> (b)   Compliance orders.—The Secretary may issue an order directing compliance with this part or with a railroad safety regulation prescribed or order issued under this part.

49 U.S.C. § 21301 entitled "Chapter 201 Violations" speaks to the issue of penalties:

> **(a)  Penalty.**

> **(1)**   Subject to section 21304 of this title, a person violating a regulation prescribed or order issued by the Secretary of Transportation under chapter 201 of this title is liable to the United States Government for a civil penalty.  The Secretary shall impose the penalty applicable under paragraph (2) of this subsection.  A separate violation occurs for each day the violation continues.

> **(2)**   The Secretary shall include in, or make applicable to, each regulation prescribed and order issued under chapter 201 of this title a civil penalty for a violation.  The amount of the penalty shall be at least $500 but not more than $10,000.  However, when a grossly negligent violation or a pattern of repeated violations has caused an imminent hazard of death or injury to individuals, or has caused death or injury, the amount may be not more than $20,000.0.

Section 21302 speaks to penalties for violation of incident reporting regulations and

Section 21303 provides for penalties for the violation of "Hours of Service" regulations.

The regulations manifesting the Secretary's enforcement and penalizing authority are found throughout the FRSA and the HMTA.[8]  49 C.F.R. 209, App. A, entitled "The Civil Penalty Process", states that:

> The front lines in the civil penalty process are the FRA safety inspectors . . . These inspectors routinely inspect the equipment, track, and signal systems and observe the operations of the nation's railroads.  They also investigate hundreds of complaints filed annually by those alleging non-compliance with the laws . . . Where the inspector determines that the best method of promoting compliance is to assess a civil penalty, he or she prepares a violation report, which is essentially a recommendation to the FRA Office of Chief Counsel to assess a penalty based on the evidence provided in or with the report.
>
> Penalty recommendations are a product of many factors, including the inherent seriousness of a condition, the type of potential safety hazard, whether actual harm has been done to persons or property, the offending railroad's general level of current compliance and recent history of compliance with the relevant set of regulations.  Id.

This penalizing authority extends to willful, intentional and grossly negligent conduct, expressly covering the subject matter of any claim for punitive damages.  *See, e.g.*, 49 U.S.C. § 21311, Subchapter II of the civil penalties section entitled "Criminal Penalties"; 49 U.S.C. § 21304, "Willfulness requirement for penalties against individuals"; 49 U.S.C. § 21302(2), penalties for "grossly negligent violations"; 49 C.F.R. 171.1(c), penalties for willful violations of HMTA.

C.   <u>**Plaintiff Has No Private Right of Action Under Either The FRA or HMTA**</u>

The FRSA does not provide for a private right of action to address violations of the Act and the regulations thereunder.  As discussed above, the Secretary of Transportation has exclusive authority for the Act's enforcement.  *See also Mehl*, 417 F.Supp.2d at 1119 ("Even if

---

[8] *See, e.g.*, 49 C.F.R. § 213.15 (penalties for track safety violations); 49 C.F.R. § 215.7 (penalties for violations of freight car safety standards).  Each section sets forth at Appendix B, a comprehensive schedule of civil penalties.

the Court were to conclude that the Plaintiff's claims were not preempted by the FRSA, to allow such claims to go forward would undoubtedly run afoul of the exclusive enforcement provisions of the FRSA.  In other words, even if the this Court concluded (as the Minnesota state district court did) that a state cause of action exists to enforce a federal standard of care, it is clear that Congress has granted the exclusive authority to resolve such claims to the Secretary of Transportation."); *Kalan*, 415 F.Supp.2d at 982 ("Preemption bars private causes of action for FRA violations.  Congress gave the Secretary of Transportation 'exclusive authority' to impose civil penalties and request injunctions of the railroad safety regulations."); *Ouelette*, 902 F.Supp. at 10-11 ("While federal preemption often means that there is no remedy available to a claimant, in many instances unfortunately this result is necessary to vindicate the intent of Congress . . . . Given the language of the FRSA, the court must conclude that Congress never intended to give individuals a private right of action to obtain damages for noncompliance with the federal regulations."); *Debiasio v. Illinois Central Railroad*, 1992 WL 297396, *3 (N.D. Ill. 1992) ("Rather than create a private cause of action, the FRSA creates an extensive regulatory scheme that places all authority over safety standards in the hands of the FRA and, in limited circumstances, certain state agencies.").

The Fifth Circuit addressed the issue of whether a private right of action exists pursuant to the FRSA in *Abate v. Southern Pacific Transp. Co.*, 928 F.2d 167 (5th Cir. 1991).  Invoking *Cort v. Ash*, 422 U.S. 66, 78 (1975), the Fifth Circuit denied the assertion of a private right of action, finding the language of the FRSA did not suggest any Congressional intent to create a private right of action in favor of any one class of persons:

---

*See also* 49 C.F.R. § 171.1(c)(HMTA penalty provision).

> Here, Congress instead has framed the statute simply as a general prohibition or a command to a federal agency. (citations omitted). The statute creates no rights in favor of individuals . . . rather, the FRSA imposes duties on a federal agency and grants the agency the power to fulfill those duties.

As the *Abate* court noted, "The structure of the FRSA indicates that Congress intended to give federal agencies, not private persons, the sole power of enforcement." 928 F.2d at 170.

## CONCLUSION

Plaintiff's claims against Union Pacific Corp. that are based on negligence, negligence per se, nuisance, trespass, conversion, strict liability and statutory/regulatory violations must yield to the comprehensive, uniform system of regulation envisioned by Congress and implemented by the Secretary of Transportation. That authority cannot allow aggrieved individuals to thwart the objective of uniformity by resort to state tort law. To allow this case to proceed against the railroad is to overthrow the Secretary's "exclusive authority" and subject railroads to varied and inconsistent duties and/or interpretations of the federal regulations in different states. Such tort actions would "generate precisely those inconsistencies in railroad safety standards that Congressional action was intended to avoid." *Mehl*, 417 F.Supp.2d at 1116 (quoting *Ouellette*, 902 F.Supp. at 10). For this reason, Union Pacific Corp. respectfully submits that Plaintiff's lawsuit against it must be dismissed with prejudice.

Respectfully submitted,

/s/ Sean F. Rommel
George L. McWilliams
Arkansas Bar No. 68078
Sean F. Rommel
Arkansas Bar No. 94158
Leisa B. Pearlman
Arkansas Bar No. 92070
Jack T. Patterson II
Arkansas Bar No. 95012

**PATTON, ROBERTS,
McWILLIAMS &  CAPSHAW, L.L.P.**
2900 St. Michael Drive, Suite 400
Post Office Box 6128
Texarkana, Texas  75505-6128
Telephone:  (903) 334-7000
Facsimile:   (903) 334-7007

**ATTORNEYS FOR DEFENDANT**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record in the above action who have agreed to service by electronic filing on this 4th day of August, 2006.


    /s/ Sean F. Rommel
Sean F. Rommel