# EXHIBIT "D"

# PART 2

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
*Union Pacific Corporation and Subsidiary Companies*

For purposes of this report, unless the context otherwise requires, all references herein to the "Corporation", "UPC", "we", "us", and "our" mean Union Pacific Corporation and its subsidiaries, including Union Pacific Railroad Company, which will be separately referred to herein as "UPRR" or the "Railroad".

## Significant Accounting Policies

**Principles of Consolidation** – The Consolidated Financial Statements include the accounts of Union Pacific Corporation and all of its subsidiaries. Investments in affiliated companies (20% to 50% owned) are accounted for using the equity method of accounting. All significant intercompany transactions are eliminated. The Corporation evaluates its less than majority-owned investments for consolidation pursuant to Financial Accounting Standards Board (FASB) Interpretation No. 46 (Revised 2003), *Consolidation of Variable Interest Entities, an Interpretation of Accounting Research Bulletin No. 51* (FIN 46(R)). The Corporation adopted the provisions of FIN 46(R) in June of 2003. We currently have no less than majority owned investments that require consolidation under FIN 46(R).

**Cash and Cash Equivalents** – Cash equivalents consist of investments with original maturities of three months or less.

**Materials and Supplies** – Materials and supplies are carried at the lower of average cost or market.

**Property and Depreciation** – Properties are carried at cost. Provisions for depreciation are computed principally on the straight-line method based on estimated service lives of depreciable property. The cost (net of salvage) of depreciable rail property retired or replaced in the ordinary course of business is charged to accumulated depreciation, and no gain or loss is recognized. A gain or loss is recognized in other income for all other property upon disposition because the gain or loss is not part of rail operations. The cost of internally developed software is capitalized and amortized over a five-year period. An obsolescence review of capitalized software is performed on a periodic basis.

**Impairment of Long-lived Assets** – We review long-lived assets, including identifiable intangibles, for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

**Revenue Recognition** – We recognize commodity revenues on a percentage-of-completion basis as freight moves from origin to destination. The allocation of revenue between reporting periods is based on the relative transit time in each reporting period with expenses recognized as incurred. Other revenue is recognized as service is performed or contractual obligations are met.

**Translation of Foreign Currency** – Our portion of the assets and liabilities related to foreign investments are translated into U.S. dollars at the exchange rates in effect at the balance sheet date. Revenues and expenses are translated at the average rates of exchange prevailing during the year. Unrealized adjustments are reflected within shareholders' equity as accumulated other comprehensive income or loss.

**Financial Instruments** – The carrying value of our non-derivative financial instruments approximates fair value. The fair value of financial instruments is generally determined by reference to market values as quoted by recognized dealers or developed based upon the present value of expected future cash flows discounted at the applicable U.S. Treasury rate, London Interbank Offered Rates (LIBOR), or swap spread.

We periodically use derivative financial instruments, for other than trading purposes, to manage risk related to changes in fuel prices and interest rates.

**Stock-Based Compensation** – We have several stock-based employee compensation plans, which are described more fully in note 7 of the Consolidated Financial Statements. We have accounted for those plans under the recognition and measurement principles of Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees*, and related interpretations. No stock-based employee compensation expense related to stock option grants is reflected in net income, as all options granted under those plans had a grant price equal to the market value of our common stock on the date of grant. Stock-based compensation expense related to retention shares, stock units, and other incentive plans is reflected in net income. The following table illustrates the effect on net income and earnings per share if we had applied the fair value recognition provisions of FASB Statement No. 123, *Accounting for Stock-Based Compensation* (FAS 123), to stock-based employee compensation. See note 11 to the Consolidated Financial Statements for discussion of FASB Statement No. 123 (R), *Share-Based Payment* (FAS 123(R)), related to the treatment of stock options. See note 8 of the Consolidated Financial Statements for reconciliation between basic earnings per share and diluted earnings per share.

| | Year Ended December 31, | | |
| *Millions of Dollars, Except Per Share Amounts* | 2005 | 2004 | 2003 |
|---|---|---|---|
| Net income, as reported | $1,026 | $ 604 | $1,585 |
| Stock-based employee compensation expense included in reported net income, net of tax | 13 | 13 | 28 |
| Total stock-based employee compensation expense determined under fair value-based method for all awards, net of tax [a] | (50) | (35) | (50) |
| Pro forma net income | $ 989 | $ 582 | $1,563 |
| EPS – basic, as reported | $ 3.89 | $2.33 | $ 6.23 |
| EPS – basic, pro forma | $ 3.75 | $2.25 | $ 6.14 |
| EPS – diluted, as reported | $ 3.85 | $2.30 | $ 6.04 |
| EPS – diluted, pro forma | $ 3.71 | $2.22 | $ 5.96 |

[a] *Stock options for executives granted in 2003 and 2002 included a reload feature. This reload feature allowed executives to exercise their options using shares of Union Pacific Corporation common stock that they already owned and obtain a new grant of options in the amount of the shares used for exercise plus any shares withheld for tax purposes. The reload feature of these option grants could only be exercised if the price of our common stock increased at least 20% from the price at the time of the reload grant. During the year ended December 31, 2005, reload option grants represented $19 million of the pro forma expense noted above. There were no reload options exercised during 2004 or 2003 and no pro forma expense for reload option grants in 2004 and 2003. Stock options exercised after the January 1, 2006 effective date of FAS 123(R) will not be eligible for the reload feature.*

**Earnings Per Share** – Basic earnings per share (EPS) are calculated on the weighted-average number of common shares outstanding during each period. Diluted EPS include shares issuable upon exercise of outstanding stock options, stock-based awards, and the potential conversion of the preferred securities where the conversion of such instruments would be dilutive.

**Use of Estimates** – Our Consolidated Financial Statements include estimates and assumptions regarding certain assets, liabilities, revenues, and expenses and the disclosure of certain contingent assets and liabilities. Actual future results may differ from such estimates.

**Income Taxes** – As required under FASB Statement No. 109, *Accounting for Income Taxes*, we account for income taxes by recording taxes payable or refundable for the current year and deferred tax assets and liabilities for the future tax consequences of events that have been recognized in our financial statements or tax returns. These expected future tax consequences are measured based on provisions of tax law as currently enacted; the effects of future changes in tax laws are not anticipated. Future tax law changes, such as a change in the corporate tax rate, could have a material impact on our financial condition or results of operations.

When appropriate, we record a valuation allowance against deferred tax assets to offset future tax benefits that may not be realized. In determining whether a valuation allowance is appropriate, we consider whether it is more likely than not that all or some portion of our deferred tax assets will not be realized, based in part on management's judgments regarding the best available evidence about future events.

**Pension and Postretirement Benefits** – We incur certain employment-related expenses associated with pensions and postretirement health benefits. In order to measure the expense associated with these benefits, we must make various assumptions including discount rates used to value certain liabilities, expected return on plan assets used to fund these expenses, salary increases, employee turnover rates, anticipated mortality rates, and expected future healthcare costs. The assumptions used by us are based on our historical experience as well as current facts and circumstances. We use third-party actuaries to assist us in properly measuring the expense and liability associated with these benefits.

**Personal Injury** – The cost of injuries to employees and others on our property is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us in properly measuring the expense and liability. Legal fees are expensed as incurred.

**Environmental** – When environmental issues have been identified with respect to property currently or formerly owned, leased, or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on such property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and such costs can be reasonably estimated. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable. Legal fees are expensed as incurred.

**Asbestos** – We estimate a liability for asserted and unasserted asbestos-related claims based on an assessment of the number and value of those claims. We use an external consulting firm to assist us in properly measuring the expense and liability. Our liability for asbestos-related claims is not discounted to present value due to the uncertainty surrounding the timing of future payments. Legal fees are expensed as incurred.

**Differences in Securities and Exchange Commission (SEC) and Surface Transportation Board (STB) Accounting** – STB accounting rules require that railroads accrue the cost of removing track structure over the expected useful life of these assets. Railroads historically used this prescribed accounting for reports filed with both the STB and SEC. In August 2001, the FASB issued Statement No. 143, *Accounting for Asset Retirement Obligations* (FAS 143). This statement was effective for us beginning January 1, 2003, and prohibits the accrual of removal costs unless there is a legal obligation to remove the track structure at the end of its life. We concluded that we did not have a legal obligation to remove the track structure, and under generally accepted accounting principles we could not accrue the cost of removal in advance. As a result, reports filed with the SEC reflect the expense of removing these assets in the period in which they are removed.

**Change in Presentation** – Certain prior year amounts have been reclassified to conform to the 2005 Consolidated Financial Statement presentation. These reclassifications were not material, individually or in aggregate, with the exception of reclassifications made to appropriately reflect the discontinued operations as discussed in note 13.

## 1. Operations and Segmentation

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable operating segment. Although revenue is analyzed by commodity, we analyze the net financial results of the Railroad as one segment due to the integrated nature of the rail network. The Consolidated Financial Statements for 2003 also include discontinued trucking operations, consisting of Overnite Transportation Company (OTC) and Motor Cargo Industries, Inc. (Motor Cargo) (see note 13 of the Consolidated Financial Statements regarding the reclassification of our trucking segment as a discontinued operation).

**Continuing Operations** – UPRR is a Class I railroad that operates in the United States. We have 32,426 route miles, linking Pacific Coast and Gulf Coast ports with the Midwest and eastern United States gateways and

providing several corridors to key Mexican gateways. We serve the western two-thirds of the country and maintain coordinated schedules with other rail carriers for the handling of freight to and from the Atlantic Coast, the Pacific Coast, the Southeast, the Southwest, Canada, and Mexico. Export and import traffic is moved through Gulf Coast and Pacific Coast ports and across the Mexican and Canadian borders. Railroad freight is comprised of six commodity groups (percent of total commodity revenues for the year ended December 31, 2005: agricultural (15%), automotive (10%), chemicals (14%), energy (20%), industrial products (22%), and intermodal (19%)).

**Discontinued Operations** – The discontinued operations represent the operations of OTC and Motor Cargo, which were sold through an initial public offering in 2003.

## 2. Financial Instruments

**Strategy and Risk** – We may use derivative financial instruments in limited instances for other than trading purposes to assist in managing risk related to changes in fuel prices and to achieve our interest rate objectives. We are not a party to leveraged derivatives and, by policy, do not use derivative financial instruments for speculative purposes. Financial instruments qualifying for hedge accounting must maintain a specified level of effectiveness between the hedging instrument and the item being hedged, both at inception and throughout the hedged period. We formally document the nature and relationships between the hedging instruments and hedged items, as well as our risk-management objectives, strategies for undertaking the various hedge transactions, and method of assessing hedge effectiveness. We may use swaps, collars, futures, and/or forward contracts to mitigate the downside risk of adverse price movements and to hedge the exposure to variable cash flows. The use of these instruments also limits future benefits from favorable movements.

The purpose of these programs is to assist in protecting our operating margins and overall profitability from adverse fuel price changes or interest rate fluctuations.

**Market and Credit Risk** – We address market risk related to derivative financial instruments by selecting instruments with value fluctuations that highly correlate with the underlying hedged item. Credit risk related to derivative financial instruments, which is minimal, is managed by requiring high credit standards for counterparties and periodic settlements. At December 31, 2005 and 2004, we were not required to provide collateral, nor had we received collateral, relating to our hedging activities.

**Determination of Fair Value** – We determined the fair values of our derivative financial instrument positions at December 31, 2005 and 2004 based upon current fair values as quoted by recognized dealers or developed based upon the present value of expected future cash flows discounted at the applicable U.S. Treasury rate, LIBOR, or swap spread.

**Interest Rate Fair Value Hedges** – We manage our overall exposure to fluctuations in interest rates by adjusting the proportion of fixed and floating rate debt instruments within our debt portfolio over a given period. We generally manage the mix of fixed and floating rate debt through the issuance of targeted amounts of each as debt matures or as we require incremental borrowings. We employ derivatives as one of the tools to obtain the targeted mix. In addition, we also obtain flexibility in managing interest costs and the interest rate mix within our debt portfolio by evaluating the issuance of and managing outstanding callable fixed-rate debt securities.

Swaps allow us to convert debt from fixed rates to variable rates and thereby hedge the risk of changes in the debt's fair value attributable to the changes in the benchmark interest rate (LIBOR). We accounted for the swaps as fair value hedges using the short-cut method pursuant to FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities;* therefore, we did not record any ineffectiveness within our Consolidated Financial Statements.

The following is a summary of our interest rate derivatives qualifying as fair value hedges:

| Millions of Dollars, Except Percentages | 2005 | 2004 |
|---|---|---|
| Interest rate fair value hedging: | | |
| Amount of debt hedged | $750 | $750 |
| Percentage of total debt portfolio | 10% | 9% |
| Gross fair value asset position | $ - | $ 8 |
| Gross fair value liability position | $(17) | $ (4) |

**Interest Rate Cash Flow Hedges –** We report changes in the fair value of cash flow hedges in accumulated other comprehensive income until the hedged item affects earnings.

In 2004, we entered into treasury lock transactions, which are accounted for as cash flow hedges. These treasury lock transactions resulted in a payment of $11 million that is being amortized on a straight-line basis over 10 years, ending September 30, 2014. The unamortized portion of the payment is recorded as a $6 million after-tax reduction to common shareholders' equity as part of accumulated other comprehensive loss at December 31, 2005. As of December 31, 2005 and 2004, we had no interest rate cash flow hedges outstanding.

**Fuel Cash Flow Hedges –** Fuel costs are a significant portion of our total operating expenses. In 2005 and 2004, our primary means of mitigating the impact of adverse fuel price changes was our fuel surcharge programs. However, we may use swaps, collars, futures and/or forward contracts to further mitigate the impact of adverse fuel price changes. We hedged 120 million gallons of fuel during 2004 using collars with average cap, floor, and ceiling prices of $0.74, $0.64, and $0.86 per gallon, respectively. At December 31, 2004, there were no fuel hedges outstanding, and we did not have any fuel hedges in place during 2005.

**Earnings Impact –** Our use of derivative financial instruments had the following impact on pre-tax income for the years ended December 31:

| Millions of Dollars | 2005 | 2004 | 2003 |
|---|---|---|---|
| Decrease in interest expense from interest rate hedging | $5 | $24 | $30 |
| Decrease in fuel expense from fuel hedging | - | 14 | 28 |
| Increase in other income from interest rate swap cancellation | - | - | 5 |
| Increase in pre-tax income | $5 | $38 | $63 |

**Fair Value of Debt Instruments –** The fair value of our short- and long-term debt was estimated using quoted market prices, where available, or current borrowing rates. At December 31, 2005 and 2004, the fair value of total debt exceeded the carrying value by approximately $460 million and $673 million, respectively. At December 31, 2005 and 2004, approximately $169 million and $282 million, respectively, of fixed-rate debt securities contained call provisions that allowed us to retire the debt instruments prior to final maturity, with the payment of fixed call premiums, or in certain cases, at par.

**Sale of Receivables –** The Railroad transfers most of its accounts receivable to Union Pacific Receivables, Inc. (UPRI), a bankruptcy-remote subsidiary, as part of a sale of receivables facility. UPRI sells, without recourse, an undivided interest in such accounts receivable to investors. The total capacity to sell undivided interests to investors under the facility was $600 million at December 31, 2005. The value of the outstanding undivided interest held by investors under the facility was $600 million and $590 million at December 31, 2005 and 2004, respectively. The value of the outstanding undivided interest held by investors is not included in our Consolidated Financial Statements. The value of the undivided interest held by investors was supported by $1,226 million and $1,089 million of accounts receivable held by UPRI at December 31, 2005 and 2004, respectively. At December 31,

2005 and 2004, the value of the interest retained by UPRI was $626 million and $499 million, respectively. This retained interest is included in accounts receivable in our Consolidated Financial Statements. The interest sold to investors is sold at carrying value, which approximates fair value, and there is no gain or loss recognized from the transaction.

The value of the outstanding undivided interest held by investors could fluctuate based upon the availability of eligible receivables and is directly affected by changing business volumes and credit risks, including default and dilution. Should our credit rating fall below investment grade, the value of the outstanding undivided interest held by investors would be reduced, and, in certain cases, the investors would have the right to discontinue the facility.

The Railroad has been designated to service the sold receivables; however, no servicing asset or liability has been recognized as the servicing fees adequately compensate the Railroad for its responsibilities. The Railroad collected approximately $13.4 billion and $12.2 billion during the years ended December 31, 2005 and 2004, respectively. UPRI used such proceeds to purchase new receivables under the facility.

The costs of the sale of receivables program are included in other income and were $23 million, $11 million, and $10 million for 2005, 2004, and 2003, respectively. The costs include interest, program fees paid to banks, commercial paper issuance costs, and fees for unused commitment availability.

The investors have no recourse to the Railroad's other assets except for customary warranty and indemnity claims. Creditors of the Railroad have no recourse to the assets of UPRI. In August 2005, the sale of receivables program was renewed for an additional 364-day period without any significant changes in terms.

## 3. Income Taxes

Components of income tax expense for continuing operations were as follows for the years ended December 31:

| Millions of Dollars | 2005 | 2004 | 2003 |
|---|---|---|---|
| Current income tax expense (benefit): | | | |
| Federal | $ 57 | $ (99) | $ 55 |
| State | 33 | (8) | 32 |
| Total current income tax expense (benefit) | 90 | (107) | 87 |
| Deferred income tax expense (benefit): | | | |
| Federal | 293 | 407 | 508 |
| State | 27 | (48) | (14) |
| Total deferred income tax expense (benefit) | 320 | 359 | 494 |
| Total | $410 | $ 252 | $581 |

For the years ended December 31, reconciliation between statutory and effective tax rates for continuing operations is as follows:

| Percentages | 2005 | 2004 | 2003 |
|---|---|---|---|
| Federal statutory tax rate | 35.0% | 35.0% | 35.0% |
| State statutory rates, net of federal benefits | 2.9 | 2.9 | 2.9 |
| Deferred tax adjustments | (8.2) | (2.9) | (0.8) |
| Tax credits | (1.2) | (5.6) | (1.7) |
| Other | 0.1 | - | - |
| Effective tax rate | 28.6% | 29.4% | 35.5% |

Deferred income tax liabilities (assets) were comprised of the following at December 31:

| Millions of Dollars | 2005 | 2004 |
|---|---|---|
| Net current deferred income tax asset | $ (304) | $ (288) |
| Property | 9,216 | 9,060 |
| State taxes, net | 592 | 581 |
| Other | (326) | (461) |
| Net long-term deferred income tax liability | 9,482 | 9,180 |
| Net deferred income tax liability | $9,178 | $8,892 |

All federal income tax years prior to 1995 are closed. Federal income tax liabilities for tax years 1986 through 1994 have been resolved. Interest calculations for these years are in process and may take several years to resolve with the Internal Revenue Service (IRS). The IRS has begun its examination of the Corporation's federal income tax returns for tax years 2003 and 2004, and has completed its examinations and issued notices of deficiency for tax years 1995 through 2002. As previously reported, among their proposed adjustments is the disallowance of tax deductions claimed in connection with certain donations of property. In the fourth quarter of 2005, the IRS National Office issued a Technical Advice Memorandum that left unresolved whether the deductions were proper, pending further factual development by the IRS Examination Team. We continue to dispute the donation issue, as well as many of the other proposed adjustments, and will contest the associated tax deficiencies through the IRS Appeals process, and, if necessary, litigation.

As reported in the Corporation's Forms 10-Q for quarters ended June 30, 2005, and September 30, 2005, the final settlements for pre-1995 tax years, along with the IRS Examination Reports for tax years 1995 through 2002, among other things, were considered in a review and re-evaluation of the Corporation's estimated deferred tax assets and liabilities. This review resulted in a reduction of deferred income tax liabilities and income tax expense of $118 million in the third quarter of 2005.

The Corporation believes it has adequately reserved for federal and state income taxes, and does not expect that resolution of these examinations will have a material adverse effect on its operating results, financial condition, or liquidity.

## 4. Debt

Total debt as of December 31, 2005 and 2004, including interest rate swaps designated as hedges, is summarized below:

| Millions of Dollars | 2005 | 2004 |
|---|---|---|
| Short-term borrowings, reclassified as long-term debt | $ - | $ 440 |
| Notes and debentures, 2.0% to 7.4% due through 2054 [a] | 5,303 | 5,435 |
| Capitalized leases, 4.7% to 9.3% due through 2026 | 1,318 | 1,416 |
| Medium-term notes, 6.8% to 10.0% due through 2020 | 372 | 372 |
| Equipment obligations, 6.5% to 10.2% due through 2019 | 270 | 313 |
| Mortgage bonds, 4.8% due through 2030 | 60 | 60 |
| Tax-exempt financings, 4.7% to 5.7% due through 2026 | 197 | 200 |
| Unamortized discount | (104) | (105) |
| Total debt | 7,416 | 8,131 |
| Less current portion | (656) | (150) |
| Total long-term debt | $6,760 | $7,981 |

[a]  2005 and 2004 include a collective write-down of $16 million and write-up of $2 million, respectively, due to market value adjustments for debt with qualifying hedges that are recorded as liabilities and assets, respectively, on the Consolidated Statements of Financial Position.

**Debt Maturities** – The following table presents aggregate debt maturities as of December 31, 2005, excluding market value adjustments.

| Millions of Dollars | |
|---|---:|
| 2006 | $  656 |
| 2007 | 783 |
| 2008 | 681 |
| 2009 | 531 |
| 2010 | 452 |
| Thereafter | 4,329 |
| Total debt | $7,432 |

**Debt Redemption** – In May 2005, we redeemed approximately $113 million of 8.35% debentures with a maturity date of May 1, 2025.

**Mortgaged Properties** – Equipment with a carrying value of approximately $3.0 billion and $3.3 billion at December 31, 2005 and 2004, respectively, serves as collateral for capital leases and other types of equipment obligations in accordance with the secured financing arrangements utilized to acquire such railroad equipment.

As a result of the merger of Missouri Pacific Railroad Company (MPRR) with and into UPRR on January 1, 1997, and pursuant to the underlying indentures for the MPRR mortgage bonds, UPRR must maintain the same value of assets after the merger in order to comply with the security requirements of the mortgage bonds. As of the merger date, the value of the MPRR assets that secured the mortgage bonds was approximately $6.0 billion. In accordance with the terms on the indentures, this collateral value must be maintained during the entire term of the mortgage bonds irrespective of the outstanding balance of such bonds.

**Credit Facilities** – On December 31, 2005, we had $2 billion in revolving credit facilities available, including $1 billion under a five-year facility expiring in March 2010 and $1 billion under a five-year facility expiring in March 2009 (collectively, the "facilities"). The facilities are designated for general corporate purposes and support the issuance of commercial paper. Neither of the facilities were drawn as of December 31, 2005. The five-year facility expiring in March 2010 replaced a $1 billion 364-day revolving credit facility that expired in March 2005, while the five-year facility expiring in March 2009 was put in place in 2004 to replace a five-year revolving credit facility that was due to expire in March 2005. Commitment fees and interest rates payable under the facilities are similar to fees and rates available to comparably rated investment-grade borrowers. These facilities allow for borrowings at floating (LIBOR-based) rates, plus a spread, depending upon our senior unsecured debt ratings. The facilities require the maintenance of a minimum net worth and a debt to net worth coverage ratio. At December 31, 2005, we were in compliance with these covenants. The facilities do not include any other financial restrictions, credit rating triggers (other than rating-dependent pricing), or any other provision that could require the posting of collateral.

In addition to our revolving credit facilities, we also had $150 million in uncommitted lines of credit that were unused at December 31, 2005. We established two $75 million uncommitted lines of credit in May and July 2005, which will expire in May and July 2006, respectively.

At December 31, 2004, approximately $440 million of short-term borrowings that we intended to refinance were reclassified as long-term debt. This reclassification reflected our ability and intent to refinance these short-term borrowings and current maturities of long-term debt on a long-term basis. At December 31, 2005, we did not reclassify any short-term debt to a long-term basis.

**Dividend Restrictions** – We are subject to certain restrictions related to the payment of cash dividends to our shareholders due to minimum net worth requirements under the credit facilities referred to above. The amount of

retained earnings available for dividends was $6.2 billion and $5.2 billion at December 31, 2005 and 2004, respectively. We do not expect that these restrictions will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity. We declared dividends of $316 million in 2005 and $312 million in 2004.

**Shelf Registration Statement** – Under a current shelf registration statement, we may issue any combination of debt securities, preferred stock, common stock, or warrants for debt securities or preferred stock in one or more offerings. At December 31, 2005, we had $500 million remaining for issuance under the current shelf registration statement. We have no immediate plans to issue any securities; however, we routinely consider and evaluate opportunities to replace existing debt or access capital through issuances of debt securities under this shelf registration, and, therefore, we may issue debt securities at any time.

## 5. Leases

We lease certain locomotives, freight cars, and other property. Future minimum lease payments for operating and capital leases with initial or remaining non-cancelable lease terms in excess of one year as of December 31, 2005 were as follows:

| Millions of Dollars | Operating Leases | Capital Leases |
| --- | --- | --- |
| 2006 | $  615 | $  199 |
| 2007 | 517 | 179 |
| 2008 | 450 | 172 |
| 2009 | 405 | 167 |
| 2010 | 359 | 147 |
| Later Years | 2,588 | 1,236 |
| Total minimum lease payments | $4,934 | $2,100 |
| Amount representing interest | N/A | (782) |
| Present value of minimum lease payments | N/A | $1,318 |

Rent expense for operating leases with terms exceeding one month was $728 million in 2005, $651 million in 2004, and $586 million in 2003. When rental payments are not made on a straight-line basis, we recognize rental expense on a straight-line basis over the lease term. Contingent rentals and sub-rentals are not significant.

## 6. Retirement Plans

**Pension and Other Postretirement Benefits**

*Pension Plans* – We provide defined benefit retirement income to eligible non-union employees through qualified and non-qualified (supplemental) pension plans. Qualified and non-qualified pension benefits are based on years of service and the highest compensation during the latest years of employment, with specific reductions made for early retirements.

*Other Postretirement Benefits (OPEB)* – We provide defined contribution medical and life insurance benefits for eligible retirees. These benefits are funded as medical claims and life insurance premiums are paid.

See note 11 to the Consolidated Financial Statements for discussion of the FASB's project to reconsider the accounting for postretirement benefits, including pensions.

**Funded Status**

*Projected Benefit Obligation (PBO)* – The PBO of our pension plans is the present value of benefits earned to date by plan participants, including the effect of assumed future salary increases. The PBO of the OPEB plan is equal to

the accumulated benefit obligation, as the present value of OPEB liabilities is not affected by salary increases. Changes in our projected benefit obligation are as follows for the years ended December 31:

| | Pension | | OPEB | |
|---|---|---|---|---|
| Millions of Dollars | 2005 | 2004 | 2005 | 2004 |
| Projected benefit obligation at beginning of year .................. | $2,058 | $1,804 | $453 | $543 |
| Service cost ............................................... | 28 | 30 | 4 | 5 |
| Interest cost ............................................. | 115 | 120 | 25 | 31 |
| Plan amendments ........................................ | - | - | (42) | (52) |
| Actuarial loss (gain) ...................................... | (18) | 219 | 70 | (34) |
| Gross benefits paid ........................................ | (118) | (115) | (34) | (40) |
| Projected benefit obligation at end of year ...................... | $2,065 | $2,058 | $476 | $453 |

*Assets* – Plan assets are measured at fair value. Changes in the fair value of our plan assets are as follows for the years ended December 31:

| | Pension | | OPEB | |
|---|---|---|---|---|
| Millions of Dollars | 2005 | 2004 | 2005 | 2004 |
| Fair value of plan assets at beginning of year ...................... | $1,693 | $1,520 | $ - | $ - |
| Actual return on plan assets .................................... | 123 | 180 | - | - |
| Voluntary funded pension plan contributions .................... | - | 100 | - | - |
| Unfunded plan benefit payments .............................. | 9 | 8 | 34 | 40 |
| Gross benefits paid ........................................ | (118) | (115) | (34) | (40) |
| Fair value of plan assets at end of year .......................... | $1,707 | $1,693 | $ - | $ - |

*Funded Status* – The funded status represents the difference between the PBO and the fair value of the plan assets. Below is a reconciliation of the funded status of the benefit plans to the net amounts recognized for the years ended December 31:

| | Pension | | OPEB | |
|---|---|---|---|---|
| Millions of Dollars | 2005 | 2004 | 2005 | 2004 |
| Funded status at end of year .................................. | $(358) | $(365) | $(476) | $(453) |
| Unrecognized net actuarial loss ................................ | 362 | 373 | 194 | 133 |
| Unrecognized prior service cost (credit) ......................... | 31 | 39 | (156) | (144) |
| Net amounts recognized at end of year .......................... | $ 35 | $ 47 | $(438) | $(464) |

*Amounts Recorded in Consolidated Statement of Financial Position* – The net amounts represent the amount previously accrued by us for pension and OPEB costs. The following table presents the amounts recognized in the Consolidated Statements of Financial Position at December 31:

| | Pension | | OPEB | |
|---|---|---|---|---|
| *Millions of Dollars* | *2005* | *2004* | *2005* | *2004* |
| Prepaid benefit cost ........................................... | $ 122 | $ 127 | $    - | $    - |
| Accrued benefit cost ........................................ | (86) | (80) | (438) | (464) |
| Additional minimum liability ................................ | (369) | (380) | - | - |
| Intangible assets ............................................. | 31 | 38 | - | - |
| Accumulated other comprehensive income ...................... | 337 | 342 | - | - |
| Net amounts recognized at end of year ........................ | $  35 | $  47 | $(438) | $(464) |

At December 31, 2005 and 2004, $42 million and $43 million, respectively, of the total pension and other postretirement liabilities were classified as current.

*Underfunded Accumulated Benefit Obligation* – The accumulated benefit obligation is the present value of benefits earned to date, assuming no future salary growth. The underfunded accumulated benefit obligation represents the difference between the accumulated benefit obligation and the fair value of plan assets. The projected benefit obligation, accumulated benefit obligation, and fair value of plan assets for pension plans with accumulated benefit obligations in excess of the fair value of the plan assets were as follows for the years ended December 31:

| *Millions of Dollars* | *2005* | *2004* |
|---|---|---|
| Projected benefit obligation ................................... | $(2,044) | $(2,042) |
| Accumulated benefit obligation ............................... | $(2,026) | $(2,014) |
| Fair value of plan assets ..................................... | 1,685 | 1,674 |
| Underfunded accumulated benefit obligation ................... | $  (341) | $  (340) |

The accumulated benefit obligation for all defined benefit pension plans was $2 billion at both December 31, 2005 and 2004.

*Assumptions* – The weighted-average actuarial assumptions used to determine benefit obligations at December 31:

| | Pension | | | OPEB | | |
|---|---|---|---|---|---|---|
| *Percentages* | *2005* | *2004* | *2003* | *2005* | *2004* | *2003* |
| Discount rate ................................ | 5.75% | 6.0% | 6.5% | 5.75% | 6.0% | 6.5% |
| Salary increase .............................. | 2.75 | 3.0 | 3.5 | N/A | N/A | N/A |
| Healthcare cost trend rate: | | | | | | |
| Current ................................ | N/A | N/A | N/A | 10.0 | 11.0 | 9.0 |
| Level in 2010 ............................ | N/A | N/A | N/A | 5.0 | 5.0 | 5.0 |

## Expense

Both pension and OPEB expense are determined based upon the annual service cost of benefits (the actuarial cost of benefits earned during a period) and the interest cost on those liabilities, less the expected return on plan assets. The expected long-term rate of return on plan assets is applied to a calculated value of plan assets that recognizes

changes in fair value over a five-year period. This practice is intended to reduce year-to-year volatility in pension expense, but it can have the effect of delaying the recognition of differences between actual returns on assets and expected returns based on long-term rate of return assumptions. The expected rate of return on assets was 8% for both 2005 and 2004. Differences in actual experience in relation to assumptions are not recognized immediately, but are deferred and, if necessary, amortized as pension or OPEB expense.

The components of our net periodic pension and other postretirement costs were as follows for the years ended December 31:

| Millions of Dollars | Pension | | | OPEB | | |
|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2005 | 2004 | 2003 |
| Service cost | $ 28 | $ 30 | $ 27 | $ 4 | $ 5 | $ 7 |
| Interest cost | 115 | 120 | 113 | 25 | 31 | 35 |
| Expected return on plan assets | (134) | (137) | (133) | - | - | - |
| Amortization of: | | | | | | |
| Transition obligation | - | (2) | (2) | - | - | - |
| Prior service cost (credit) | 7 | 8 | 9 | (30) | (24) | (15) |
| Actuarial loss | 5 | 3 | 1 | 14 | 18 | 16 |
| Total net periodic benefit cost | $ 21 | $ 22 | $ 15 | $ 13 | $ 30 | $ 43 |

*Assumptions* – The weighted-average actuarial assumptions used to determine expense were as follows for the years ended December 31:

| Percentages | Pension | | | OPEB | | |
|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2005 | 2004 | 2003 |
| Discount rate | 6.00% | 6.50% | 6.75% | 6.00% | 6.50% | 6.75% |
| Expected return on plan assets | 8.00 | 8.00 | 8.00 | N/A | N/A | N/A |
| Salary increase | 3.00 | 3.50 | 3.75 | N/A | N/A | N/A |
| Healthcare cost trend rate: | | | | | | |
| Current | N/A | N/A | N/A | 11.00 | 9.00 | 10.00 |
| Level in 2010 | N/A | N/A | N/A | 5.00 | 5.00 | 5.00 |

The discount rate is based on a hypothetical portfolio of high quality bonds with cash flows matching our plans' expected benefit payments. The expected return on plan assets is based on our asset allocation mix and our historical return, taking into account current and expected market conditions. The actual return on pension plan assets, net of fees, was approximately 7% in 2005, compared to 12% in 2004. Our historical annualized ten-year rate of return on plan assets is approximately 9%.

Assumed healthcare cost trend rates have a significant effect on the expense and liabilities reported for healthcare plans. The healthcare cost trend rate is based on historical rates and expected market conditions. A one-percentage point change in the expected healthcare cost trend rates would have the following effects on OPEB:

| Millions of Dollars | One % pt. Increase | One % pt. Decrease |
|---|---|---|
| Effect on total service and interest cost components | $ 6 | $ (5) |
| Effect on accumulated benefit obligation | 90 | (74) |

**Equity Adjustment**

An additional minimum pension liability adjustment is required when our accumulated benefit obligation exceeds the fair value of our plan assets, and that difference exceeds the net pension liability recognized in the Consolidated Statements of Financial Position. The liability was recorded as a $211 million and $212 million after-tax reduction to common shareholders' equity as part of accumulated other comprehensive loss in 2005 and 2004, respectively.

The equity reduction may be restored to the balance sheet in future periods if the fair value of plan assets exceeds the accumulated benefit obligations. This reduction to equity does not affect net income or cash flow and has no impact on compliance with debt covenants.

**Cash Contributions**

The following table details our cash contributions for the years ended December 31, 2005 and 2004, and the expected contributions for 2006:

| | Pension | | |
|---|---|---|---|
| Millions of Dollars | Funded | Unfunded | OPEB |
| 2004 ............................. | $100 | $ 8 | $40 |
| 2005 ............................. | - | 9 | 34 |
| 2006 ............................. | 50 | 10 | 32 |

Our policy with respect to funding the qualified plans is to fund at least the minimum required by the Employee Retirement Income Security Act of 1974, as amended, and not more than the maximum amount deductible for tax purposes. We do not currently have minimum funding requirements under applicable employee benefit and tax laws. All contributions made to the funded pension plans for 2004 were voluntary and were made with cash generated from operations. In January 2006, we made a $50 million voluntary contribution to the funded pension plan. No further contributions are expected during 2006.

All benefit payments for other postretirement benefits are voluntary, as the postretirement plans are not funded, and are not subject to any minimum regulatory funding requirements. Benefit payments for each year represent claims paid for medical and life insurance, and we anticipate our 2006 OPEB payments will be made from cash generated from operations.

**Benefit Payments**

The following table details expected benefit payments for the years 2006 though 2015:

| Millions of Dollars | Pension | OPEB |
|---|---|---|
| 2006 ................................................ | $117 | $ 32 |
| 2007 ................................................ | 119 | 34 |
| 2008 ................................................ | 121 | 35 |
| 2009 ................................................ | 125 | 37 |
| 2010 ................................................ | 129 | 38 |
| Years 2011 – 2015 ................................. | 724 | 192 |

## Asset Allocation Strategy

Our pension plan asset allocation at December 31, 2005 and 2004, and target allocation for 2006, are as follows:

| Asset Category | Target Allocation 2006 | Percentage of Plan Assets December 31, 2005 | 2004 |
|---|---|---|---|
| Equity securities | 65% to 75% | 75% | 73% |
| Debt securities | 20% to 30% | 24 | 27 |
| Real estate | 2% to 8% | 1 | - |
| Total | 100% | 100% | 100% |

The investment strategy for pension plan assets is to maintain a broadly diversified portfolio designed to achieve our target of an average long-term rate of return of 8%. While we believe we can achieve a long-term average rate of return of 8%, we cannot be certain that the portfolio will perform to our expectations. Assets are strategically allocated between equity and debt securities in order to achieve a diversification level that mitigates wide swings in investment returns. To further improve diversification, a target allocation to real estate investments has been established for future time periods. Asset allocation target ranges for equity, debt, and other portfolios are evaluated at least every three years with the assistance of an external consulting firm. Actual asset allocations are monitored monthly, and rebalancing actions are executed at least quarterly, if needed.

The majority of the plan's assets are invested in equity securities, because equity portfolios have historically provided higher returns than debt and other asset classes over extended time horizons, and are expected to do so in the future. Correspondingly, equity investments also entail greater risks than other investments. The risk of loss in the plan's equity portfolio is mitigated by investing in a broad range of equity types. Equity diversification includes large-capitalization and small-capitalization companies, growth-oriented and value-oriented investments, and U.S. and non-U.S. securities.

Equity risks are further balanced by investing a significant portion of the plan's assets in high quality debt securities. The average quality rating of the debt portfolio exceeded AA as of December 31, 2005 and 2004. The debt portfolio is also broadly diversified and invested primarily in U.S. Treasury, mortgage, and corporate securities with an intermediate average maturity. The weighted-average maturity of the debt portfolio was 6.5 years and 6.3 years at December 31, 2005 and 2004, respectively.

The investment of pension plan assets in our securities is specifically prohibited for both the equity and debt portfolios, other than through index fund holdings.

## Other Retirement Programs

*Thrift Plan* – We provide a defined contribution plan (thrift plan) to eligible non-union employees and make matching contributions to the thrift plan. We match 50 cents for each dollar contributed by employees up to the first six percent of compensation contributed. Our thrift plan contributions were $12 million per year in 2005, 2004, and 2003.

*Railroad Retirement System* – All Railroad employees are covered by the Railroad Retirement System (the System). Contributions made to the System are expensed as incurred and amounted to approximately $595 million in 2005, $569 million in 2004, and $562 million in 2003.

*Collective Bargaining Agreements* – Under collective bargaining agreements, we provide certain postretirement healthcare and life insurance benefits for eligible union employees. Premiums under the plans are expensed as incurred and amounted to $41 million in 2005, $30 million in 2004, and $27 million in 2003.

## 7. Stock Options and Other Stock Plans

We have 2,938,450 options outstanding under the 1993 Stock Option and Retention Stock Plan of Union Pacific Corporation (1993 Plan). There are 7,140 restricted shares outstanding under the 1992 Restricted Stock Plan for Non-Employee Directors of Union Pacific Corporation. We no longer grant options or awards of restricted stock or retention shares and units under these plans.

The UP Shares Stock Option Plan of Union Pacific Corporation (UP Shares Plan) was approved by our Board of Directors on April 30, 1998. The UP Shares Plan reserved 12,000,000 shares of our common stock for issuance. The UP Shares Plan was a broad-based option program that granted options to purchase 200 shares of our common stock at $55.00 per share to eligible active employees on April 30, 1998. All options granted were non-qualified options that became exercisable on May 1, 2001, and remain exercisable until April 30, 2008. If an optionee's employment terminates for any reason, the option remains exercisable for a period of one year after the date of termination, but no option is exercisable after April 30, 2008. No further options may be granted under the UP Shares Plan. As of December 31, 2005, there were 2,096,681 options outstanding under the UP Shares Plan.

We adopted the Executive Stock Purchase Incentive Plan (ESPIP), effective October 1, 1999, in order to encourage and facilitate ownership of our common stock by our officers and other key executives. Under the ESPIP, participants purchased a total of 1,008,000 shares of our common stock with the proceeds of 6.02% interest-bearing, full recourse loans from the Corporation. Loans totaled $47 million and had a final maturity date of January 31, 2006. Deferred cash payments were to be awarded to the participants to repay interest and the loan principal if certain performance and retention criteria were met within a 40-month period ending January 31, 2003. Following satisfaction of the various performance criteria during the term of the ESPIP and continued employment with the Corporation through January 31, 2003, participants received a deferred cash payment equal to two-thirds of the outstanding principal balance of their loan plus the net accrued interest on January 31, 2003. Such payments were applied against the participants' outstanding loan balance pursuant to the terms of the ESPIP. The remaining loan balances were repaid in three equal installments on January 31, 2004, January 31, 2005, and January 31, 2006. At December 31, 2005 and 2004, the total outstanding balance of the remaining loans was $0.4 million and $1 million, respectively. All remaining loan balances were repaid as of January 31, 2006.

In April 2000, the shareholders approved the Union Pacific Corporation 2000 Directors Plan (Directors Plan) whereby 550,000 shares of our common stock were reserved for issuance to our non-employee directors. Under the Directors Plan, each non-employee director, upon his or her initial election to the Board of Directors, receives a grant of 1,000 shares of restricted shares or restricted stock units. Additionally, each non-employee director receives annually an option to purchase at fair value a number of shares of our common stock, not to exceed 5,000 shares during any calendar year, determined by dividing 60,000 by 1/3 of the fair market value of one share of our common stock on the date of such Board of Directors meeting, with the resulting quotient rounded up or down to the nearest 50 shares. As of December 31, 2005, 5,000 restricted shares were outstanding under the Directors Plan and 155,800 options were outstanding under the Directors Plan.

The Union Pacific Corporation 2001 Stock Incentive Plan (2001 Plan) was approved by the shareholders in April 2001. The 2001 Plan reserved 12,000,000 shares of our common stock for issuance to eligible employees of the Corporation and its subsidiaries in the form of non-qualified options, incentive stock options, retention shares, stock units, and incentive bonus awards. Non-employee directors are not eligible for awards under the 2001 Plan. As of December 31, 2005, 5,007,628 options and 880,526 retention shares and stock units were outstanding under the 2001 Plan.

The Union Pacific Corporation 2004 Stock Incentive Plan (2004 Plan) was approved by shareholders in April 2004. The 2004 Plan reserved 21,000,000 shares of our common stock for issuance, plus any shares subject to awards made under the 2001 Plan and the 1993 Plan that were outstanding on April 16, 2004, and became available for regrant pursuant to the terms of the 2004 Plan. Under the 2004 Plan, non-qualified options, stock

appreciation rights, retention shares, stock units, and incentive bonus awards may be granted to eligible employees of the Corporation and its subsidiaries. Non-employee directors are not eligible for awards under the 2004 Plan. As of December 31, 2005, 2,237,650 options and 124,750 retention shares and stock units were outstanding under the 2004 Plan.

In January 2006, our Board of Directors approved a new Long Term Plan (LTP). Participants were awarded stock units subject to the attainment of certain performance targets and continued employment through January 31, 2009. The LTP performance criteria used to determine the number of stock units that will be earned during the 37-month performance period is annual return on invested capital (ROIC), calculated by the Compensation and Benefits Committee of the Board of Directors, which may be adjusted to reflect the effect of special transactions or events such as significant gains on the sale of real estate, tax adjustments, accounting changes or reclassifications. At the end of year one of the performance period, a participant may earn up to one-third of the target number of stock units granted to him or her based on the first year of ROIC performance achieved. At the end of year two, the participant may earn additional stock units up to a total of two-thirds of the target number of stock units granted to him or her based on the average of the first two years of ROIC performance achieved. During year three of the performance period, the participant may earn up to 200% of the target number of stock units granted to him or her based on the average of all three years of ROIC performance achieved. Stock units that are earned under the LTP will be paid out in shares of our common stock.

Pursuant to the above plans, 19,303,495; 21,571,309; and 6,899,211 shares of our common stock were available for grant at December 31, 2005, 2004, and 2003, respectively.

**Options** – Stock options are granted with an exercise price equal to the fair market value of our common stock as of the date of the grant. Options are granted with a 10-year term and are generally exercisable one to two years after the date of the grant. A summary of the stock options issued under the 1993 Plan, the UP Shares Plan, the Directors Plan, the 2001 Plan, and the 2004 Plan, and changes during the years ending December 31 are as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2005 | | 2004 | | 2003 | |
| | Shares | Weighted-Average Exercise Price | Shares | Weighted-Average Exercise Price | Shares | Weighted-Average Exercise Price |
| Outstanding, beginning of year | 17,522,133 | $56.17 | 18,515,231 | $53.75 | 21,352,105 | $53.00 |
| Granted | 4,462,260 | 64.71 | 2,220,450 | 65.04 | 2,398,300 | 55.98 |
| Exercised | (9,408,918) | 55.91 | (2,942,406) | 47.52 | (4,955,725) | 51.58 |
| Forfeited | (139,266) | 57.88 | (271,142) | 57.23 | (279,449) | 54.69 |
| Outstanding, end of year | 12,436,209 | $59.41 | 17,522,133 | $56.17 | 18,515,231 | $53.75 |
| Options exercisable at year end | 10,087,771 | $59.42 | 14,878,933 | $54.92 | 15,514,331 | $53.27 |
| Weighted-average fair value of options granted during the year | N/A | $12.92 | N/A | $16.38 | N/A | $14.30 |

The following table summarizes information about our outstanding stock options as of December 31, 2005:

| Range of Exercise Prices | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| | Number Outstanding | Weighted-Average Remaining Contractual Life | Weighted-Average Exercise Price | Number Exercisable | Weighted-Average Exercise Price |
| $37.94 – $55.98 | 4,352,139 | 3.45 yrs. | $52.27 | 4,350,039 | $52.27 |
| $56.19 – $61.14 | 4,341,773 | 6.39 | 59.05 | 2,097,623 | 58.97 |
| $61.44 – $80.55 | 3,742,297 | 7.43 | 68.14 | 3,640,109 | 68.22 |
| $37.94 – $80.55 | 12,436,209 | 5.67 yrs. | $59.41 | 10,087,771 | $59.42 |

The fair value of each option grant was estimated on the date of grant using the Black-Scholes option-pricing model, with the following weighted-average assumptions for options granted in 2005, 2004, and 2003.

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Risk-free interest rates | 3.8% | 3.3% | 2.9% |
| Dividend yield | 1.9% | 1.7% | 1.5% |
| Expected lives (years) | 4.8 | 5.6 | 5.0 |
| Volatility | 20.6% | 25.9% | 28.4% |

**Restricted Stock and Other Stock Incentive Plans** – Our plans provide for awarding retention shares of common stock or stock units to eligible employees. These awards are subject to forfeiture if employment terminates during the prescribed retention period, generally three or four years. Restricted stock awards are issued to non-employee directors and are subject to forfeiture if certain service requirements are not met. During the year ended December 31, 2005, 115,600 retention shares, stock units, and restricted shares were issued at a weighted-average fair value of $59.35. During the year ended December 31, 2004, 276,575 retention shares, stock units, and restricted shares were issued at a weighted-average fair value of $64.75. During the year ended December 31, 2003, 380,786 retention shares, stock units, and restricted shares were issued at a weighted-average fair value of $55.99. The cost of retention and restricted awards is amortized to expense over the retention period.

During the years ended December 31, 2005, 2004, and 2003, we expensed $21 million, $21 million, and $46 million, respectively, related to the restricted stock and other incentive plans described above.

## 8. Earnings Per Share

The following table provides a reconciliation between basic and diluted earnings per share for the years ended December 31:

| Millions, Except Per Share Amounts | 2005 | 2004 | 2003 |
|---|---|---|---|
| Income statement data: | | | |
| Income from continuing operations | $1,026 | $ 604 | $1,056 |
| Income from discontinued operations | - | - | 255 |
| Cumulative effect of accounting change | - | - | 274 |
| Net income available to common shareholders – basic | $1,026 | $ 604 | $1,585 |
| Dilutive effect of interest associated with the Convertible Preferred Securities | - | - | 34 |
| Net income available to common shareholders – diluted | $1,026 | $ 604 | $1,619 |
| Weighted-average number of shares outstanding: | | | |
| Basic | 263.4 | 259.1 | 254.4 |
| Dilutive effect of stock options | 1.5 | 1.2 | 1.5 |
| Dilutive effect of retention shares, stock units and restricted shares | 1.6 | 1.9 | 1.8 |
| Dilutive effect of Convertible Preferred Securities | - | - | 10.3 |
| Diluted | 266.5 | 262.2 | 268.0 |
| Earnings per share – basic: | | | |
| Income from continuing operations | $ 3.89 | $ 2.33 | $ 4.15 |
| Income from discontinued operations | - | - | 1.00 |
| Cumulative effect of accounting change | - | - | 1.08 |
| Net income | $ 3.89 | $ 2.33 | $ 6.23 |
| Earnings per share – diluted: | | | |
| Income from continuing operations | $ 3.85 | $ 2.30 | $ 4.07 |
| Income from discontinued operations | - | - | 0.95 |
| Cumulative effect of accounting change | - | - | 1.02 |
| Net income | $ 3.85 | $ 2.30 | $ 6.04 |

Common stock options totaling 1.4 million and 3.3 million for 2005 and 2004, respectively, were excluded from the computation of diluted earnings per share because the exercise prices of these options exceeded the average market price of our common stock for the respective periods, and the effect of their inclusion would be anti-dilutive. All stock options were dilutive for 2003.

## 9. Commitments and Contingencies

**Unasserted Claims** – Various claims and lawsuits are pending against us and certain of our subsidiaries. It is not possible at this time for us to determine fully the effect of all unasserted claims on our consolidated financial condition, results of operations or liquidity; however, to the extent possible, where unasserted claims can be estimated and where such claims are considered probable, we have recorded a liability. We do not expect that any known lawsuits, claims, environmental costs, commitments, contingent liabilities, or guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity after taking into account liabilities previously recorded for these matters.

**Personal Injury** – The cost of personal injuries to employees and others related to our activities is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries

to assist us in measuring the expense and liability, including unasserted claims. Compensation for work-related accidents is governed by the Federal Employers' Liability Act (FELA). Under FELA, damages are assessed based on a finding of fault through litigation or out-of-court settlements.

Our personal injury liability activity was as follows:

| Millions of Dollars | 2005 | 2004 | 2003 |
|---|---|---|---|
| Beginning balance | $ 639 | $ 619 | $ 674 |
| Accruals | 247 | 288 | 250 |
| Payments | (267) | (268) | (305) |
| Ending balance at December 31 | $ 619 | $ 639 | $ 619 |
| Current portion, ending balance at December 31 | $ 274 | $ 274 | $ 276 |

Our personal injury liability is discounted to present value using applicable U.S. Treasury rates. Personal injury accruals were higher in 2004 due to a 1998 crossing accident verdict upheld in 2004 and a 2004 derailment near San Antonio.

**Asbestos –** We are a defendant in a number of lawsuits in which current and former employees allege exposure to asbestos. Additionally, we have received claims for asbestos exposure that have not been litigated. The claims and lawsuits (collectively referred to as "claims") allege occupational illness resulting from exposure to asbestos-containing products. In most cases, the claimants do not have credible medical evidence of physical impairment resulting from the alleged exposures. Additionally, most claims filed against us do not specify an amount of alleged damages.

The greatest potential for asbestos exposure in the railroad industry existed while steam locomotives were used. The railroad industry, including UPRR and its predecessors, phased out steam locomotives between 1955 and 1960. The use of asbestos-containing products in the railroad industry was substantially reduced after steam locomotives were discontinued, although it was not completely eliminated. Some asbestos-containing products were still manufactured in the building trade industry and were used in isolated component parts on locomotives and railroad cars during the 1960s and 1970s. By the early 1980s, manufacturers of building materials and locomotive component parts developed non-asbestos alternatives for their products and ceased manufacturing asbestos-containing materials.

Prior to 2004, we concluded it was not possible to reasonably estimate the cost of disposing of asbestos-related claims that might be filed against us in the future, due to a lack of sufficient comparable history from which to reasonably estimate unasserted asbestos-related claims. As a result, we recorded a liability for asbestos-related claims only when the claims were asserted.

During 2004, we determined we could reasonably estimate our liability for unasserted asbestos-related claims because we had sufficient comparable loss data and there was no immediate legislative solution to asbestos litigation. During 2004, we engaged a third-party with extensive experience in estimating resolution costs for asbestos-related claims to assist us in assessing the number and value of these unasserted claims through 2034, based on our average claims experience over a multi-year period. As a result, we increased our liability for asbestos-related claims in the fourth quarter of 2004. The liability for resolving both asserted and unasserted claims was based on the following assumptions:

- The number of claims received in 2005 will be consistent with average claims received between 2000 and 2003.

- The number of claims to be filed against us will decline each year after 2005.

- The average settlement values for asserted and unasserted claims will be equivalent to those experienced between 2002 and 2004.

- The percentage of claims dismissed between 2002 and 2004 will continue through 2034.

Our asbestos-related liability activity was as follows:

| Millions of Dollars | 2005 | 2004 | 2003 |
|---|---|---|---|
| Beginning balance | $324 | $ 51 | $ 58 |
| Accruals | - | 287 | 7 |
| Payments | (13) | (14) | (14) |
| Ending balance at December 31 | $311 | $324 | $ 51 |
| Current portion, ending balance at December 31 | $ 16 | $ 17 | $ 9 |

Our liability for asbestos-related claims is not discounted to present value due to the uncertainty surrounding the timing of future payments. Approximately 16% of the recorded liability related to asserted claims, and approximately 84% related to unasserted claims. These claims are expected to be paid out over the next 29 years. During the third quarter of 2005, our third-party consultants assisted us in reviewing our actual asbestos claim experience through the first half of 2005 compared to the assumptions used in the 2004 estimate, and we determined that no adjustment to our estimate was necessary at this time. We will continue to review actual experience and adjust our estimate as warranted.

Insurance coverage reimburses us for a portion of the costs incurred to resolve asbestos-related claims, and we have recognized an asset for estimated insurance recoveries.

We believe that our liability estimates for asbestos-related claims and the estimated insurance recoveries reflect reasonable and probable estimates. The amounts recorded for asbestos-related liabilities and related insurance recoveries were based on currently known facts. However, future events, such as the number of new claims to be filed each year, average settlement costs, and insurance coverage issues could cause the actual costs and insurance recoveries to be higher or lower than the projected amounts. Estimates may also vary due to changes in the litigation environment, federal and state law governing compensation of asbestos claimants, and the level of payments made to claimants by other defendants.

Additionally, we have a legal obligation to properly dispose of asbestos-containing materials. The estimated fair value of this obligation is $5 million at December 31, 2005, which is recorded as a liability on the Consolidated Statements of Financial Position pursuant to FIN 47.

**Environmental Costs –** We are subject to federal, state, and local environmental laws and regulations. We have identified approximately 370 sites at which we are or may be liable for remediation costs associated with alleged contamination or for violations of environmental requirements. This includes 43 sites that are the subject of actions taken by the U.S. government, 23 of which are currently on the Superfund National Priorities List. Certain federal legislation imposes joint and several liability for the remediation of identified sites; consequently, our ultimate environmental liability may include costs relating to activities of other parties, in addition to costs relating to our own activities at each site.

When an environmental issue has been identified with respect to the property owned, leased, or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on the property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and such costs can be reasonably estimated. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable.

Our environmental liability activity was as follows:

| Millions of Dollars | 2005 | 2004 | 2003 |
|---|---|---|---|
| Beginning balance | $201 | $187 | $188 |
| Accruals | 45 | 46 | 26 |
| Payments | (33) | (32) | (27) |
| Ending balance at December 31 | $213 | $201 | $187 |
| Current portion, ending balance at December 31 | $ 46 | $ 50 | $ 57 |

The environmental liability includes costs for remediation and restoration of sites, as well as for ongoing monitoring costs, but excludes any anticipated recoveries from third parties. Cost estimates are based on information available for each site, financial viability of other potentially responsible parties, and existing technology, laws, and regulations. We believe that we have adequately accrued for our ultimate share of costs at sites subject to joint and several liability. However, the ultimate liability for remediation is difficult to determine because of the number of potentially responsible parties involved, site-specific cost sharing arrangements with other potentially responsible parties, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs. Estimates may also vary due to changes in federal, state, and local laws governing environmental remediation. We do not expect current obligations to have a material adverse effect on our results of operations or financial condition.

**Guarantees** – At December 31, 2005, we were contingently liable for $486 million in guarantees. We have recorded a liability of $7 million for the fair value of these obligations as of December 31, 2005. We entered into these contingent guarantees in the normal course of business, and they include guaranteed obligations related to our headquarters building, equipment financings, and affiliated operations. The final guarantee expires in 2022. We are not aware of any existing event of default that would require us to satisfy these guarantees. We do not expect that these guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity.

**Income Taxes** – As previously reported in our Form 10-Q for the quarter ended September 30, 2005, the IRS has completed its examinations and issued notices of deficiency for tax years 1995 through 2002. Among their proposed adjustments is the disallowance of tax deductions claimed in connection with certain donations of property. In the fourth quarter of 2005, the IRS National Office issued a Technical Advice Memorandum which left unresolved whether the deductions were proper, pending further factual development by the IRS Examination Team. We continue to dispute the donation issue, as well as many of the other proposed adjustments, and will contest the associated tax deficiencies through the IRS Appeals process, and, if necessary, litigation. We do not expect that the ultimate resolution of these examinations will have a material adverse effect on our operating results, financial condition, or liquidity. In addition, the IRS has begun its examination of tax years 2003 and 2004.

**Insurance Subsidiaries** – We have two consolidated, wholly-owned subsidiaries that provide insurance coverage for certain risks including physical loss or property damage and certain other claims that are subject to reinsurance. At December 31, 2005, current accounts receivable and current accrued casualty costs included $65 million for reinsurance receivables and reinsured liability, respectively, held by one of our insurance subsidiaries related to losses sustained during the West Coast storm in January 2005. This amount may change in the future as facts and circumstances surrounding the claim and the reinsurance are finalized and settled. We collected a partial recovery of our claim from reinsurance of $25 million during the fourth quarter of 2005.

## 10. Other Income

Other income included the following for the years ended December 31:

| Millions of Dollars | 2005 | 2004 | 2003 |
|---|---|---|---|
| Net gain on non-operating asset dispositions | $135 | $ 69 | $ 84 |
| Rental income | 59 | 55 | 57 |
| Interest income | 17 | 10 | 8 |
| Sale of receivable fees | (23) | (11) | (10) |
| Non-operating environmental costs and other | (43) | (35) | (61) |
| Total | $145 | $ 88 | $ 78 |

## 11. Accounting Pronouncements

In December 2004, the FASB issued Statement No. 123(R). The statement requires that we recognize compensation expense equal to the fair value of stock options or other share-based payments starting January 1, 2006. We adopted the statement on a modified prospective basis, using the Black-Scholes option-pricing model to calculate the fair value of stock options. We expect that the incremental, full-year compensation expense in 2006 related to the adoption of the statement will be approximately $13 million for new awards granted after January 1, 2006 and an additional $2 million for the unvested portion of awards granted in prior years. The expense for awards granted after implementation of Statement No. 123(R) will be based upon their grant-date fair value. The expense for those awards will be based on the estimated number of awards that are expected to vest. That estimate will be revised if subsequent information indicates that the actual number of awards to vest will differ from the estimate. The estimate does not materially impact our calculation of compensation expense.

In March 2005, the FASB issued FIN 47. This interpretation clarifies that the term conditional asset retirement obligations, as used in FASB Statement No. 143, refers to a legal obligation to perform an asset retirement activity in which the timing or method of settlement, or both, are conditional on a future event that may or may not be within the control of the entity. An entity must recognize a liability for the fair value of a conditional asset retirement obligation if the fair value of the liability can be reasonably estimated. We assessed the impact of the interpretation on our financial statements, determined that we have a legal obligation to properly dispose of asbestos-containing materials, and recorded a $5 million liability at December 31, 2005, for the fair value of this obligation.

In May 2005, the FASB issued FAS 154, *Accounting Changes and Error Corrections, a Replacement of APB Opinion No. 20 and FASB Statement No. 3*. This statement requires retrospective application to prior periods' financial statements of changes in accounting principle, unless it is impracticable to determine either the period-specific effects or the cumulative effect of the change. It carries forward without change the previous guidance for reporting the correction of an error and a change in accounting estimate. FAS 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005.

In July 2005, the FASB issued an exposure draft, *Accounting for Uncertain Tax Positions, an Interpretation of FASB Statement No. 109*. As drafted, the interpretation would require companies to recognize the best estimate of the impact of a tax position only if that position is probable of being sustained during a tax audit. However, in November 2005 the FASB voted to replace the probable threshold with a more-likely-than-not criterion when determining if the impact of a tax position should be recorded. The FASB expects to issue a final interpretation in the first quarter of 2006. When it is available, we will review the final interpretation to determine the impact it may have on our Consolidated Financial Statements.

In September 2005, the FASB issued an exposure draft, *Earnings per Share, an Amendment of FASB Statement No. 128*. The draft clarifies guidance for the treasury stock method, contracts that may be settled in cash or shares,

and contingently issuable shares. The FASB expects to issue a final statement in the first quarter of 2006. We are currently reviewing this proposed exposure draft to determine the impact it may have on our calculation of earnings per share.

In December 2005, the FASB deliberated issues relating to the limited-scope, first phase of its project to reconsider the accounting for postretirement benefits, including pensions. The FASB decided that the objectives and scope of this phase include, among other items, recognizing the overfunded or underfunded status of defined benefit postretirement plans as an asset or a liability in the statement of financial position. The FASB expects to issue an Exposure Draft for the initial phase in the first quarter of 2006. In the second multi-year phase of the project, the FASB expects to comprehensively consider a variety of issues related to the accounting for postretirement benefits, including expense recognition, obligation measurement, and whether postretirement benefit trusts should be consolidated by the plan sponsor. We will review the proposed standards when they are available to determine the impact they may have on our Consolidated Financial Statements.

## 12. Cumulative Effect of Accounting Change

STB accounting rules require that railroads accrue the cost of removing track structure over the expected useful life of these assets. Railroads historically used this prescribed accounting for reports filed with both the STB and SEC. In August 2001, the FASB issued FAS 143. This statement was effective for us beginning January 1, 2003, and prohibits the accrual of removal costs unless there is a legal obligation to remove the track structure at the end of its life. We concluded that we did not have a legal obligation to remove the track structure, and, therefore, under generally accepted accounting principles, we could not accrue the cost of removal in advance. As a result, reports filed with the SEC will reflect the expense of removing these assets in the period in which they are removed. For STB reporting requirements only, we will continue to follow the historical method of accruing in advance, as prescribed by the STB. FAS 143 also requires us to record a liability for legally obligated asset retirement costs associated with tangible long-lived assets. In the first quarter of 2003, we recorded income from a cumulative effect of accounting change, related to the adoption of FAS 143, of $274 million, net of income tax expense of $167 million. The accounting change had no effect on our liquidity. Had the change been retroactively applied, the change would not have had a material impact on net income and earnings per share.

## 13. Discontinued Operations

On November 5, 2003, we completed the sale of our entire trucking interest through an initial public offering. As part of the offering, we received cash proceeds of $620 million, including a dividend from OTC of $128 million. As part of the transaction, OTC forgave our intercompany payable to them of $227 million, and we received a $1 million promissory note. We recorded a gain on the sale of $211 million, including an income tax benefit of $126 million in the fourth quarter of 2003. The tax benefit recognized in 2003 is associated with OTC goodwill written off in the fourth quarter of 1998. Revenue from discontinued operations was $1,241 million for the year ended December 31, 2003. Income before income taxes from discontinued operations was $74 million for the year ended December 31, 2003.

## 14. Selected Quarterly Data (Unaudited)

Selected unaudited quarterly data are as follows:

| *Millions of Dollars, Except Per Share Amounts* | | | | |
|---|---|---|---|---|
| **2005** | *Mar. 31* | *June 30* | *Sep. 30[a]* | *Dec. 31* |
| Operating revenues ............................... | $3,152 | $3,344 | $3,461 | $3,621 |
| Operating income ................................. | 313 | 468 | 481 | 533 |
| Net income ........................................ | 128 | 233 | 369 | 296 |
| Net income per share | | | | |
|    Basic ........................................ | 0.49 | 0.89 | 1.40 | 1.11 |
|    Diluted ...................................... | 0.48 | 0.88 | 1.38 | 1.10 |
| **2004** | *Mar. 31* | *June 30* | *Sep. 30* | *Dec. 31[b]* |
| Operating revenues ............................... | $2,893 | $3,029 | $3,076 | $3,217 |
| Operating income ................................. | 314 | 359 | 418 | 204 |
| Net income ........................................ | 165 | 158 | 202 | 79 |
| Net income per share | | | | |
|    Basic ........................................ | 0.64 | 0.61 | 0.78 | 0.30 |
|    Diluted ...................................... | 0.63 | 0.60 | 0.77 | 0.30 |

[a]  In the third quarter of 2005, we recorded an income tax expense reduction of $118 million.
[b]  In the fourth quarter of 2004, we recognized a $154 million after-tax charge for unasserted asbestos-related claims.

*******************************************

### Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

### Item 9A. Controls and Procedures

As of the end of the period covered by this report, the Corporation carried out an evaluation, under the supervision and with the participation of the Corporation's management, including the Corporation's Chief Executive Officer (CEO) and Executive Vice President – Finance and Chief Financial Officer (CFO), of the effectiveness of the design and operation of the Corporation's disclosure controls and procedures pursuant to Exchange Act Rules 13a-15 and 15d-15. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. Based upon that evaluation, the CEO and the CFO concluded that, as of the end of the period covered by this report, the Corporation's disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified by the SEC, and that such information is accumulated and communicated to management, including the CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

Additionally, the CEO and CFO determined that there have been no significant changes to the Corporation's internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) during the last fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Corporation's internal control over financial reporting.

## MANAGEMENT'S ANNUAL REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

The management of Union Pacific Corporation and Subsidiary Companies (the Corporation) is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). The Corporation's internal control system was designed to provide reasonable assurance to the Corporation's management and Board of Directors regarding the preparation and fair presentation of published financial statements.

All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

The Corporation's management assessed the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2005. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control – Integrated Framework*. Based on our assessment management believes that, as of December 31, 2005, the Corporation's internal control over financial reporting is effective based on those criteria.

The Corporation's independent registered public accounting firm has issued an audit report on our assessment of the Corporation's internal control over financial reporting. This report appears on page 75.

February 8, 2006

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Union Pacific Corporation, its Directors, and Shareholders:

We have audited management's assessment, included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting, that Union Pacific Corporation and Subsidiary Companies (the Corporation) maintained effective internal control over financial reporting as of December 31, 2005, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Corporation's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that the Corporation maintained effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also in our opinion, the Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and consolidated financial statement schedule as of and for the year ended December 31, 2005 of the Corporation and our report dated February 17, 2006 expressed an unqualified opinion on those consolidated financial statements and consolidated financial statement schedule.

*Deloitte & Touche LLP*

Omaha, Nebraska
February 17, 2006

## Item 9B. Other Information

None.

# PART III

## Item 10. Directors and Executive Officers of the Registrant

(a)   Directors of Registrant.

Information as to the names, ages, positions and offices with UPC, terms of office, periods of service, business experience during the past five years and certain other directorships held by each director or person nominated to become a director of UPC is set forth in the Election of Directors segment of the Proxy Statement and is incorporated herein by reference.

Information concerning our Audit Committee and the independence of its members, along with information about the audit committee financial expert(s) serving on the Audit Committee, is set forth in the Audit Committee segment of the Proxy Statement and is incorporated herein by reference.

(b)   Executive Officers of Registrant.

Information concerning the executive officers of UPC and its subsidiaries is presented in Part I of this report under Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries.

(c)   Section 16(a) Compliance.

Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 is set forth in the Section 16(a) Beneficial Ownership Reporting Compliance segment of the Proxy Statement and is incorporated herein by reference.

(d)   Code of Ethics for Chief Executive Officer and Senior Financial Officers of Registrant.

The Board of Directors of UPC has adopted the UPC Code of Ethics for the Chief Executive Officer and Senior Financial Officers (the "Code"). A copy of the Code may be found on the Internet at our website www.up.com/investors. We intend to disclose any amendments to the Code or any waiver from a provision of the Code on our website.

## Item 11. Executive Compensation

Information concerning compensation received by our directors and certain executive officers is presented in the Compensation of Directors, Report on Executive Compensation, Summary Compensation Table, Security Ownership of Management, Option/SAR Grants Table, Aggregated Option/SAR Exercises in Last Fiscal Year and FY-End Option/SAR Values Table, Defined Benefit Plans and Change in Control Arrangements segments of the Proxy Statement and is incorporated herein by reference. Additional information regarding compensation of directors, including Board committee members, is set forth in the By-Laws of UPC and the Stock Unit Grant and Deferred Compensation Plan for the Board of Directors, both of which are included as exhibits to this report.

## Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Information as to the number of shares of our equity securities beneficially owned by each of our directors and nominees for director, our five most highly compensated executive officers, our directors and executive officers as a group, and certain beneficial owners is set forth in the Election of Directors and Security Ownership of Management segments of the Proxy Statement and is incorporated herein by reference.

The following table summarizes the equity compensation plans under which Union Pacific Corporation common stock may be issued as of December 31, 2005.

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders . . . . . . . . . . . . . . . . . . . | 11,069,004[1] | $60.27[2] | 19,692,695 |
| Equity compensation plans not approved by security holders [3] . . . . . . . . . . . . . . . . | 2,096,681 | $55.00 | - |
| Total . . . . . . . . . . . . . . . . . . . . . . | 13,165,685 | $59.41 | 19,692,695 |

[1]  Includes 729,476 retention units that do not have an exercise price. Does not include 287,940 retention shares that are actually issued and outstanding.

[2]  Does not include the retention units or retention shares described above in footnote [1].

[3]  The UP Shares Stock Option Plan (UP Shares Plan) is the only equity compensation plan not approved by shareholders. The UP Shares Plan was approved by the Company's Board of Directors on April 30, 1998 and reserved 12,000,000 shares of Common Stock for issuance. The UP Shares Plan was a broad-based option program that granted each active employee on April 30, 1998 non-qualified options to purchase 200 shares of Common Stock at $55.00 per share. Options became exercisable on May 1, 2001 and expire on April 30, 2008. If an optionee's employment terminates for any reason, the option remains exercisable for a period of one year after the date of termination, but no option is exercisable after April 30, 2008. No further options may be granted under the UP Shares Plan.

## Item 13. Certain Relationships and Related Transactions

Information on related transactions is set forth in the Certain Relationships and Related Transactions and Compensation Committee Interlocks and Insider Participation segments of the Proxy Statement and is incorporated herein by reference. We do not have any relationship with any outside third party which would enable such a party to negotiate terms of a material transaction that may not be available to, or available from, other parties on an arm's-length basis.

## Item 14. Principal Accounting Fees and Services

Information concerning the fees billed by our independent registered public accounting firm and the nature of services comprising the fees for each of the two most recent fiscal years in each of the following categories: (i) audit fees, (ii) audit – related fees, (iii) tax fees, and (iv) all other fees, is set forth in the Audit Committee Report segment of the Proxy Statement and is incorporated herein by reference.

Information concerning our Audit Committee's policies and procedures pertaining to pre-approval of audit and non-audit services rendered by our independent registered public accounting firm is set forth in the Audit Committee segment of the Proxy Statement and is incorporated herein by reference.

## PART IV

## Item 15. Exhibits, Financial Statement Schedules

(a)   Financial Statements, Financial Statement Schedules, and Exhibits:

   (1)   Financial Statements

         The financial statements filed as part of this filing are listed on the index to the Financial Statements and
         Supplementary Data, Item 8, on page 43.

   (2)   Financial Statement Schedules
         Schedule II – Valuation and Qualifying Accounts

         Schedules not listed above have been omitted because they are not applicable or not required or the
         information required to be set forth therein is included in the Financial Statements and Supplementary
         Data, Item 8, or notes thereto.

   (3)   Exhibits

         Exhibits are listed in the exhibit index on page 82. The exhibits include management contracts,
         compensatory plans and arrangements required to be filed as exhibits to the Form 10-K by Item 601
         (10) (iii) of Regulation S-K.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 24th day of February, 2006.

UNION PACIFIC CORPORATION

By /s/   James R. Young

    James R. Young
    President, Chief Executive
    Officer and Director

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below, on this 24th day of February, 2006, by the following persons on behalf of the registrant and in the capacities indicated.

PRINCIPAL EXECUTIVE OFFICER
AND DIRECTOR:

    /s/   James R. Young

    James R. Young
    President, Chief Executive
    Officer and Director

PRINCIPAL FINANCIAL OFFICER:

    /s/   Robert M. Knight, Jr.

    Robert M. Knight, Jr.,
    Executive Vice President – Finance and
    Chief Financial Officer

PRINCIPAL ACCOUNTING OFFICER:

    /s/   Richard J. Putz

    Richard J. Putz,
    Vice President and Controller

DIRECTORS:

| | |
|---|---|
| Philip F. Anschutz* | Spencer F. Eccles* |
| Richard K. Davidson* | Judith Richards Hope* |
| Erroll B. Davis, Jr.* | Michael W. McConnell* |
| Thomas J. Donohue* | Steven R. Rogel* |
| Archie W. Dunham* | Ernesto Zedillo Ponce de Leon* |

* By  /s/   Thomas E. Whitaker

    Thomas E. Whitaker, Attorney-in-fact

## SCHEDULE II – VALUATION AND QUALIFYING ACCOUNTS
*Union Pacific Corporation and Subsidiary Companies*

| Millions of Dollars, for the Years Ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Allowance for doubtful accounts: | | | |
| Balance, beginning of period | $ 107 | $ 101 | $ 108 |
| Charged to expense | 2 | 11 | 13 |
| Net recoveries / (write-offs) | 17 | (5) | (20) |
| Balance, end of period | $ 126 | $ 107 | $ 101 |
| Allowance for doubtful accounts are presented in the Consolidated Statements of Financial Position as follows: | | | |
| Current | $ 16 | $ 19 | $ 17 |
| Long-term | 110 | 88 | 84 |
| Balance, end of period | $ 126 | $ 107 | $ 101 |
| Accrued casualty costs: | | | |
| Balance, beginning of period | $1,303 | $ 989 | $1,077 |
| Charged to expense | 409 | 683 | 403 |
| Cash payments and other reductions | (358) | (369) | (491) |
| Balance, end of period | $1,354 | $1,303 | $ 989 |
| Accrued casualty costs are presented in the Consolidated Statements of Financial Position as follows: | | | |
| Current | $ 478 | $ 419 | $ 394 |
| Long-term | 876 | 884 | 595 |
| Balance, end of period | $1,354 | $1,303 | $ 989 |

**Union Pacific Corporation**
**Exhibit Index**

| Exhibit No. | Description |
|---|---|

**Filed with this Statement**

| | |
|---|---|
| 10(a) | Form of 2006 Long Term Plan Stock Unit Agreement. |
| 10(b) | Form of Stock Unit Agreement for Executives. |
| 10(c) | Form of Non-Qualified Stock Option Agreement for Executives. |
| 10(d) | UPC Executive Incentive Plan, effective May 5, 2005. |
| 10(e) | Supplemental Thrift Plan of UPC, as amended December 21, 2005. |
| 10(f) | The Supplemental Pension Plan for Officers and Managers of UPC and Affiliates, as amended December 21, 2005. |
| 10(g) | Executive Incentive Plan (2005) – Deferred Compensation Program, dated December 21, 2005 |
| 12 | Ratio of Earnings to Fixed Charges. |
| 21 | List of the Corporation's significant subsidiaries and their respective states of incorporation. |
| 23 | Independent Registered Public Accounting Firm's Consent. |
| 24 | Powers of attorney executed by the directors of UPC. |
| 31(a) | Certifications Pursuant to Rule 13a-14(a), of the Exchange Act, as Adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – James R. Young. |
| 31(b) | Certifications Pursuant to Rule 13a-14(a), of the Exchange Act, as Adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – Robert M. Knight, Jr. |
| 32 | Certifications Pursuant to 18 U.S.C. Section 1350, as Adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 – James R. Young and Robert M. Knight, Jr. |

**Incorporated by Reference**

| | |
|---|---|
| 3(a) | Revised Articles of Incorporation of UPC, as amended through April 25, 1996, are incorporated herein by reference to Exhibit 3 to the Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 1996. |
| 3(b) | By-Laws of UPC, as amended, effective July 1, 2005, are incorporated herein by reference to Exhibit 3(b) of the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005. |



| 4(a) | Indenture, dated as of December 20, 1996, between UPC and Citibank, N.A., as Trustee, is incorporated herein by reference to Exhibit 4.1 to UPC's Registration Statement on Form S-3 (No. 333-18345). |

4(b)    Indenture, dated as of April 1, 1999, between UPC and JP Morgan Chase Bank, formerly The Chase Manhattan Bank, as Trustee, is incorporated herein by reference to Exhibit 4.2 to UPC's Registration Statement on Form S-3 (No. 333-75989).

4(c)    Form of Debt Security is incorporated herein by reference to Exhibit 4.3 to UPC's Registration Statement on Form S-3 (No. 33-59323).

Certain instruments evidencing long-term indebtedness of UPC are not filed as exhibits because the total amount of securities authorized under any single such instrument does not exceed 10% of the Corporation's total consolidated assets. UPC agrees to furnish the Commission with a copy of any such instrument upon request by the Commission.

10(h)   Amended and Restated Registration Rights Agreement, dated as of July 12, 1996, among UPC, UP Holding Company, Inc., Union Pacific Merger Co. and Southern Pacific Rail Corporation (SP) is incorporated herein by reference to Annex J to the Joint Proxy Statement/Prospectus included in Post-Effective Amendment No. 2 to UPC's Registration Statement on Form S-4 (No. 33-64707).

10(i)   Agreement, dated September 25, 1995, among UPC, UPRR, Missouri Pacific Railroad Company (MPRR), SP, Southern Pacific Transportation Company (SPT), The Denver & Rio Grande Western Railroad Company (D&RGW), St. Louis Southwestern Railway Company (SLSRC) and SPCSL Corp. (SPCSL), on the one hand, and Burlington Northern Railroad Company (BN) and The Atchison, Topeka and Santa Fe Railway Company (Santa Fe), on the other hand, is incorporated by reference to Exhibit 10.11 to UPC's Registration Statement on Form S-4 (No. 33-64707).

10(j)   Supplemental Agreement, dated November 18, 1995, between UPC, UPRR, MPRR, SP, SPT, D&RGW, SLSRC and SPCSL, on the one hand, and BN and Santa Fe, on the other hand, is incorporated herein by reference to Exhibit 10.12 to UPC's Registration Statement on Form S-4 (No. 33-64707).

10(k)   UPC 2001 Stock Incentive Plan, dated April 20, 2001, is incorporated herein by reference to Exhibit 99 to UPC's Current Report on Form 8-K dated March 8, 2001.

10(l)   UPC 2004 Stock Incentive Plan, effective as of April 16, 2004, is incorporated herein by reference to Exhibit 10 to UPC's Current Report on Form 8-K dated March 10, 2004.

10(m)   UP Shares Stock Option Plan of UPC, effective April 30, 1998, is incorporated herein by reference to Exhibit 4.3 to UPC's Registration Statement on Form S-8 (No. 333-57958).

10(n)   The Executive Incentive Plan of UPC, as amended May 31, 2001, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.

10(o)   Written Description of Premium Exchange Program Pursuant to 1993 Stock Option and Retention Stock Plan of UPC is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 1999.

10(p)   The 1993 Stock Option and Retention Stock Plan of UPC, as amended May 30, 2002, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002.

| | |
|---|---|
| 10(q) | UPC 2000 Directors Stock Plan is incorporated herein by reference to Exhibit 99 to UPC's Current Report on Form 8-K filed March 9, 2000. |
| 10(r) | UPC Key Employee Continuity Plan dated November 16, 2000, is incorporated herein by reference to Exhibit 10(o) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2000. |
| 10(s) | The Pension Plan for Non-Employee Directors of UPC, as amended January 25, 1996, is incorporated herein by reference to Exhibit 10(w) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1995. |
| 10(t) | The Executive Life Insurance Plan of UPC, as amended October 1997, is incorporated herein by reference to Exhibit 10(t) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1997. |
| 10(u) | The UPC Stock Unit Grant and Deferred Compensation Plan for the Board of Directors, as amended January 1, 2003, is incorporated herein by reference to Exhibit 10(a) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2004. |
| 10(v) | Charitable Contribution Plan for Non-Employee Directors of Union Pacific Corporation is incorporated herein by reference to Exhibit 10(z) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1995. |
| 10(w) | Written Description of Other Executive Compensation Arrangements of Union Pacific Corporation is incorporated herein by reference to Exhibit 10(q) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1998. |
| 10(x) | Form of Non-Qualified Stock Option Agreement for Executives is incorporated herein by reference to Exhibit 10(a) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(y) | Form of Stock Unit Agreement for Executives is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(z) | Form of Stock Unit Agreement for Executive Incentive Premium Exchange Program is incorporated herein by reference to Exhibit 10(c) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(aa) | Form of Non-Qualified Stock Option Agreement for Directors is incorporated herein by reference to Exhibit 10(d) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |

Exhibit 12

## RATIO OF EARNINGS TO FIXED CHARGES
*Union Pacific Corporation and Subsidiary Companies*

| Millions of Dollars, Except for Ratios | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| Earnings: | | | | | |
|   Income from continuing operations | $1,026 | $ 604 | $1,056 | $1,265 | $ 934 |
|   Equity earnings net of distributions | (48) | (47) | 15 | (34) | (48) |
| Total earnings | 978 | 557 | 1,071 | 1,231 | 886 |
| Income taxes | 410 | 252 | 581 | 680 | 545 |
| Fixed charges: | | | | | |
|   Interest expense including amortization of debt discount | 504 | 527 | 574 | 632 | 700 |
|   Portion of rentals representing an interest factor | 220 | 206 | 169 | 172 | 177 |
| Total fixed charges | 724 | 733 | 743 | 804 | 877 |
| Earnings available for fixed charges | $2,112 | $1,542 | $2,395 | $2,715 | $2,308 |
| Ratio of earnings to fixed charges | 2.9 | 2.1 | 3.2 | 3.4 | 2.6 |

**Exhibit 21**

## SIGNIFICANT SUBSIDIARIES OF UNION PACIFIC CORPORATION

| Name of Corporation | State of Incorporation |
|---|---|
| Union Pacific Railroad Company | Delaware |
| Southern Pacific Rail Corporation | Utah |

Exhibit 23

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Post-Effective Amendment No. 1 to Registration Statement No. 33-12513, Registration Statement No. 33-53968, Registration Statement No. 33-49785, Registration Statement No. 33-49849, Registration Statement No. 33-51071, Registration Statement No. 333-10797, Registration Statement No. 333-13115, Registration Statement No. 333-16563, Registration Statement No. 333-88225, Registration Statement No. 333-88709, Registration Statement No. 333-57958, Registration Statement No. 333-61856, Registration Statement No. 333-42768, Registration Statement No. 333-106707, Registration Statement No. 333-106708, Registration Statement No. 333-105714, Registration Statement No. 333-105715, and Registration Statement No. 333-116003 on Forms S-8 and Registration No. 333-88666, Amendment No. 1 to Registration Statement No. 333-88666, and Registration Statement No. 333-111185 on Forms S-3 of our reports dated February 17, 2006, relating to the consolidated financial statements and consolidated financial statement schedule of Union Pacific Corporation and Subsidiary Companies (which report expressed an unqualified opinion and included an explanatory paragraph relating to the change in method of accounting for asset retirement obligations in 2003) and management's report on the effectiveness of internal control over financial reporting, appearing in this Annual Report on Form 10-K of Union Pacific Corporation and Subsidiary Companies for the year ended December 31, 2005.

Deloitte & Touche LLP

Omaha, Nebraska
February 22, 2006

**Exhibit 24**

## UNION PACIFIC CORPORATION
## Powers of Attorney

Each of the undersigned directors of Union Pacific Corporation, a Utah corporation (the "Company"), do hereby appoint each of James R. Young, Barbara W. Schaefer, and Thomas E. Whitaker his or her true and lawful attorney-in-fact and agent, to sign on his or her behalf the Company's Annual Report on Form 10-K, for the year ended December 31, 2005, and any and all amendments thereto, and to file the same, with all exhibits thereto, with the Securities and Exchange Commission.

IN WITNESS WHEREOF, the undersigned have executed this Power of Attorney as of February 23, 2006.

| | |
|---|---|
| /s/   Phillip F. Anschutz | /s/   Spencer F. Eccles |
| Phillip F. Anschutz | Spencer F. Eccles |
| /s/   Richard K. Davidson | /s/   Judith Richards Hope |
| Richard K. Davidson | Judith Richards Hope |
| /s/   Erroll B. Davis, Jr. | /s/   Michael W. McConnell |
| Erroll B. Davis, Jr. | Michael W. McConnell |
| /s/   Thomas J. Donohue | /s/   Steven R. Rogel |
| Thomas J. Donohue | Steven R. Rogel |
| /s/   Archie W. Dunham | /s/   Ernesto Zedillo |
| Archie W. Dunham | Ernesto Zedillo |

Exhibit 31(a)

## CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER

I, James R. Young, certify that:

1.  I have reviewed this annual report on Form 10-K of Union Pacific Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 24, 2006

/s/   James R. Young
_____
James R. Young
President and
Chief Executive Officer

**Exhibit 31(b)**

## CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER

I, Robert M. Knight, Jr., certify that:

1.  I have reviewed this annual report on Form 10-K of Union Pacific Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 24, 2006

/s/   Robert M. Knight, Jr.
_____
Robert M. Knight, Jr.
Executive Vice President – Finance and
Chief Financial Officer

90

**Exhibit 32**

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the accompanying Annual Report of Union Pacific Corporation (the Corporation) on Form 10-K for the period ending December 31, 2005, as filed with the Securities and Exchange Commission on the date hereof (the Report), I, James R. Young, President and Chief Executive Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

By: /s/   James R. Young

James R. Young
President and
Chief Executive Officer
Union Pacific Corporation

February 24, 2006

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

## CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the accompanying Annual Report of Union Pacific Corporation (the Corporation) on Form 10-K for the period ending December 31, 2005, as filed with the Securities and Exchange Commission on the date hereof (the Report), I, Robert M. Knight, Jr., Executive Vice President – Finance and Chief Financial Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

By: /s/   Robert M. Knight, Jr.

Robert M. Knight, Jr.
Executive Vice President – Finance and
Chief Financial Officer
Union Pacific Corporation

February 24, 2006

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

# CORPORATE INFORMATION

## CORPORATE HEADQUARTERS

Union Pacific Corporation
1400 Douglas Street
Omaha, NE 68179
(402) 544-5000
**www.up.com**

Union Pacific Railroad Company
1400 Douglas Street
Omaha, NE 68179
**www.up.com**

## TRANSFER AGENT AND REGISTRAR OF STOCK

Computershare Investor Services, LLC

*For U.S. Mail:*
P.O. Box 1689
Chicago, IL 60690

*For Express Service Delivery:*
2 North LaSalle Street
Chicago, IL 60602

Most questions regarding your account may be answered by contacting the automated Computershare Investor Services Help Line at (800) 317-2512 from your touch-tone phone, 24 hours a day, 7 days a week. Service representatives are available on the Help Line from 8 a.m. to 5 p.m. Central Time, Monday through Friday. You may also write to Computershare at the appropriate address above, or you may contact Computershare online at **www.computershare.com**.

## STOCK LISTING

New York Stock Exchange (NYSE)
Ticker Symbol: UNP

## ANNUAL MEETING OF SHAREHOLDERS

May 4, 2006
Little America Hotel
500 South Main Street
Salt Lake City, UT

## INFORMATION SOURCES

The contact for media inquiries is Corporate Relations at (402) 544-3529. Institutional investors and financial analysts can contact Investor Relations at (402) 544-4227 or (877) 547-7261. Written inquiries for Corporate or Investor Relations can be directed to Union Pacific Corporation's address listed above.

Individual shareholder questions should be directed to the Corporation's Transfer Agent using the contact information above.

## SEC FILINGS AND OTHER CORPORATE INFORMATION

Union Pacific makes available free of charge on our Internet Web site at **www.up.com/investors** our annual reports on Form 10-K, our quarterly reports on Form 10-Q, our current reports on Form 8-K, our proxy statements, Forms 3, 4 and 5, filed on behalf of directors and executive officers, and amendments to such reports filed or furnished pursuant to the Securities Exchange Act of 1934, as amended, as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission (SEC). We also make available on our Web site previously filed SEC reports and exhibits via a link to "EDGAR" on the SEC's Internet site at **www.sec.gov**. Additionally, our corporate governance materials (including Board Committee charters, governance guidelines and policies, and codes of conduct and ethics for directors, officers and employees), news releases, investor fact books and other general information about Union Pacific are available on our Web site. From time to time, the corporate governance materials on our Web site may be updated as necessary to comply with rules issued by the SEC and NYSE or as desirable to promote the effective and efficient governance of our company.

Copies of Union Pacific's 2005 Annual Report/Form 10-K and other corporate materials also are available, without charge, by writing to:

Secretary
Union Pacific Corporation
1400 Douglas Street, 19th Floor
Omaha, NE 68179



**BUILDING AMERICA®**